# Herbert Webb v. United States Fidelity & Guaranty Company

[605 A.2d 1344]

No. 89-629

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed February 21, 1992

**Allen, C.J.** Plaintiff appeals from a judgment awarding him $30,000 under the uninsured-underinsured (UM) motorist cov-

erage (Part C) of his insurance policy issued by defendant (USF&G). USF&G cross-appeals from the award of prejudgment interest.

The plaintiff was injured in a motor vehicle accident and received the policy limit of $20,000 from the liability carrier for the operator of the other vehicle involved. He claimed that his damages exceeded $70,000 and that he was therefore entitled to the policy limit of $50,000 under Part C of his policy with USF&G. The policy contained a clause entitling USF&G to offset any amount the plaintiff recovered from any other source responsible for plaintiff's injuries. The issue to be resolved on plaintiff's appeal is whether the offset is made against the total amount of the plaintiff's damages or against the limit of coverage under Part C of the policy. In its cross-appeal, USF&G argues that the award of prejudgment interest from the date of the accident was error. We affirm the decision on the offset issue and reverse in part on the question of prejudgment interest.

## I.

The policy language in question is in Part C, which is entitled "Uninsured Motorists Coverage." It begins with an "Insuring Agreement," which states in relevant part:

> We will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury: . . . .[1]

Part C also contains a section entitled "Limit of Liability," which states in part:

> The limit of liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one accident.

The Limit of Liability section contains an "offset-reduction" clause that states in relevant part:

> Any amounts otherwise payable for damages under this coverage shall be reduced by all sums:
>
> 1. Paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible.

---

[1] The policy definition of "uninsured motor vehicle" makes clear that uninsured motorists coverage includes coverage of underinsured motor vehicles as well, as required under 23 V.S.A. § 941(f).

The trial court rendered judgment in USF&G's favor, concluding that

> David Desorcie was "underinsured" to the extent of $30,000.00, the difference between the $50,000.00 UM policy with USF&G and the $20,000.00 Desorcie liability policy; that Plaintiff shall recover of Defendant $30,000.00, plus prejudgment interest thereon computed at a rate of 12 percent per annum from [the date of the accident] to the date hereof; . . . .

Plaintiff relies on a case construing nearly identical language, *Mulliss v. American Protection Ins. Co.*, 653 F. Supp. 685 (D. Vt. 1987). In that case the trial court found ambiguity in the policy:

> In the instant case, the disputed policy language appears to be susceptible of two possible interpretations. On the one hand, we agree with plaintiff that the word "damages" in the offset-reduction clause could easily be interpreted as referring to all "*damages* which a covered person is legally entitled to recover", (emphasis supplied) as stated in the broad language of the Insuring Agreement of Part C. On the other hand, it is possible to interpret the words "damages under this coverage" in the offset-reduction clause to mean simply that the $40,000 limit of coverage under the policy shall be reduced by all payments made by or on behalf of the tortfeasor.

*Id.* at 688. Noting that the Vermont Supreme Court had not yet decided the issue, the court in *Mulliss* held that because the "Limit of Liability" clause was ambiguous, the ambiguity should be resolved in favor of the insured. *Id.* at 688–89. On the basis of nearly identical "Insuring Agreement" language in the policy before us, plaintiff urges this Court to follow the rationale in *Mulliss*.

There are no easy guidelines for determining when a clause or phrase of a contract is ambiguous. We have said that "[a]mbiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 579, 556 A.2d 81, 84 (1988). It is not uncom-

mon in insurance cases for the issue of ambiguity to arise in the context of two or more clauses or phrases in different parts of an agreement, rather than in the interpretation of the meaning of a single phrase or sentence. See, e.g., *Sanders v. St. Paul Mercury Ins. Co.*, 148 Vt. 496, 501, 536 A.2d 914, 917 (1987).

In *Sanders*, plaintiff was injured by an uninsured motorist and asserted that payment of four separate premiums for four cars under her policy allowed her four times the stated policy maximum of $25,000 for UM coverage. In making her argument, plaintiff pointed to variations in policy language in the applicable UM coverage provision, compared with slightly different language in parallel provisions of the same policy. In affirming the trial court's grant of summary judgment to defendant, we stated:

> In the present case the argument for ambiguity is the variance between two parallel provisions of the policy, each dealing with limits of liability. We would apply the variance in language to plaintiff's benefit if she had provided the predicate for doing so by pointing out some reason why Part C could not be interpreted definitively without reference to some other contract provision. Plaintiff has not provided such a reason, and we do not perceive one.

*Id.*

Plaintiff in the instant case likewise argues his case for ambiguity on the basis of allegedly inconsistent policy provisions, and our task is to read the provisions, both separately and together, and then to determine whether the net effect is ambiguous in light of "the surrounding circumstances." *Isbrandtsen*, 150 Vt. at 579, 556 A.2d at 84.

Relying on *Mulliss*, plaintiff argues first that the phrase "amounts otherwise payable for damages" in the offset-reduction clause of Part C can be read to refer either to the clause in the Insuring Agreement of Part C, or to the clause in the Limit of Liability provisions of Part C, resulting in an ambiguity. If the reference is to the Insuring Agreement, then the amount recovered from the tortfeasor or his insurer is to be subtracted from the actual amount of the insured's damages. If the reference is to the Limit of Liability provision, then the amount recovered from the tortfeasor or his insured is to be subtracted from the liability limit shown in the declarations, which in this

case is $50,000. Plaintiff contends that the provision is ambiguous, and should be resolved in his favor by construing the offset-reduction clause to refer to the Insuring Agreement. We do not agree, and hold that the phrase in the offset-reduction clause refers to the limit of $50,000 stated in the Declarations referenced in the opening clause of the "Limit of Liability."

To read the phrase as referring to the Insuring Agreement would remove it from its immediate context and ignore the language, logic, and format of the policy as a whole.[2] The insuring agreement defines the circumstances for which damages will be paid, and the limit-of-liability section sets forth the maximum amount payable. The amount otherwise payable from which the offset must be made is $50,000, which represents the maximum that USF&G could be called upon to pay under its UM coverage. Our interpretation is consistent with 23 V.S.A. § 941(f), which provides that a motor vehicle is underinsured only "to the extent that its personal injury limits of liability at the time of an accident are less than the limits of uninsured motorists coverage applicable to any injured party legally entitled to recover damages under said uninsured motorist coverage." *Brunet v. American Ins. Co.*, 660 F. Supp. 843, 848 (D. Vt. 1987); *Stanhope v. Lumbermens Mutual Ins. Co.*, 155 Vt. 645, 646, 582 A.2d 150, 151 (1990).

Vermont's statutory underinsured motorist provision provides what is sometimes referred to as "gap" coverage, because it "fills the 'gap' between the tortfeasor's liability coverage and the injured party's underinsured motorist coverage." *North River Ins. Co. v. Tabor*, 934 F.2d 461, 464 (3d Cir. 1991). Gap coverage "places the insured party in the same position that he would have been in had the tortfeasor carried liability insurance in the amount of the insured's underinsured motorist policy limit." *Id.*; see also *Higgins v. Fireman's Fund Ins. Co.*, 160

---

[2] Plaintiff's theory of UM coverage would also effectively negate 23 V.S.A. § 941(e), under which the UM carrier is entitled, to the extent of its payment, to the proceeds of any settlement or recovery from the uninsured or underinsured motorist. See *Muir v. Hartford Accident & Indemnity Co.*, 147 Vt. 590, 594, 522 A.2d 236, 239 (1987). If USF&G had paid its full $50,000 UM limit immediately following the accident, § 941(e) would entitle it to recoup the $20,000 available under the Desorcie policy. But under plaintiff's theory, that recoupment would be unavailable.

Ariz. 20, 22, 770 P.2d 324, 326 (1989) ("purpose of uninsured motorist coverage is to place the injured party in the same position as to the recovery of damages that he would have been in if the tortfeasor had possessed liability insurance"). In contrast to gap coverage provisions, some statutes employ an excess coverage theory, under which the insured may recover underinsured motorist benefits until his policy limits are reached or he is fully compensated for his damages, whichever comes first. By definition, such excess coverage allows an offset against total actual damages, not only against the stated UM policy limit of liability. See *Hamilton v. Farmers Ins. Co. of Washington*, 107 Wash. 2d 721, 727, 733 P.2d 213, 216 (1987). Pennsylvania is an example of an excess coverage state; its statute defines an "underinsured motor vehicle" as any "motor vehicle for which the limits of available liability insurance . . . are insufficient to pay losses and damages." 75 Pa. Cons. Stat. § 1702.

▮ In the present case, Part C of the USF&G policy could have offered broader coverage than that mandated by § 941(f), but it did not. The "Limit of Liability" section of Part C states that the "limit of liability shown in the Declarations for this coverage [i.e., UM coverage] is our maximum limit of liability for all damages resulting from any one accident." The same provision goes on to say that "[a]ny amounts otherwise payable" are to be reduced by all sums paid "by or on behalf of persons or organizations who may be legally responsible." The phrase "otherwise payable" follows the "limit of liability" language of Part C and can mean only that the $50,000 limit of liability is to be reduced by recoveries from the tortfeasor or his carrier.

Persuasive precedents in other jurisdictions support this outcome. See *Aetna Casualty & Surety Co. v. Kenner*, 570 A.2d 1172, 1177 (Del. 1990); *Giardino v. American Family Ins.*, 164 Ill. App. 3d 389, 391, 517 N.E.2d 1187, 1188 (1987); *Davidson v. United States Fidelity & Guaranty Co.*, 78 N.C. App. 140, 144, 336 S.E.2d 709, 710 (1985), *aff'd*, 316 N.C. 551, 342 S.E.2d 523 (1986); *In re Nationwide Ins. Co.*, 45 Ohio St. 3d 11, 13, 543 N.E.2d 89, 92 (1989) (overruling *Gomolka v. State Automobile Mutual Ins. Co.*, 15 Ohio St. 3d 27, 472 N.E.2d 700 (1984)). But see *Weber v. American Mut. Ins. Co.*, 868 F.2d 286, 288 (8th Cir. 1989); *Wood v. American Family Mutual Ins. Co.*, 148 Wis. 2d 639, 641, 436 N.W.2d 594, 600 (1989).

Plaintiff argues that our reading of the UM clause of the policy means that policyholders will never receive the uninsured motorist policy limits in underinsurance cases. This proposition is necessarily true, but it does not mean that policyholders are not benefiting fully from their purchase of UM coverage. Uninsured and underinsured motorist coverage, as § 941 makes clear, applies whenever the tortfeasor has no insurance coverage or has insufficient coverage, as defined in § 941(f). If a tortfeasor has no liability insurance, the UM policyholder may recover up to the UM policy limits. If a tortfeasor's liability insurance equals or exceeds that of the UM policyholder, the UM provision does not apply at all, and no one would suggest that the policyholder has been shortchanged because the eventuality for which the coverage was purchased did not occur. The underinsured tortfeasor presents a case between the example of the uninsured and the fully insured tortfeasor. Part of the eventuality for which UM coverage was purchased occurs, but not the complete eventuality, i.e., an accident with a completely uninsured tortfeasor. It is therefore axiomatic in underinsurance cases that the tortfeasor's insurer will pay some amount, and that amount, however small, will prevent the Limit of Liability ceiling from being reached. This result does not deprive the UM insured of a promised benefit or in any way contravene law or public policy. See *Sanders v. St. Paul Mercury Ins. Co.*, 148 Vt. at 504–07, 536 A.2d at 919–21 (plaintiff failed to show deprivation of promised benefits or other unfairness of policy provision application).

## II.

USF&G on cross-appeal contends that the trial court erred in granting prejudgment interest, arguing that UM carriers are not liable for prejudgment interest that would result in the total payment exceeding the policy limits, citing *Russo v. Kemper Group*, 146 A.D.2d 701, 702–03, 537 N.Y.S.2d 200, 202 (1989). This proposition is true if the UM payment is made as of the date on which it becomes due and owing, but it requires a determination of when the UM carrier should be deemed liable to make payment. After that date it is equitable to regard amounts which should have been paid as belonging to the insured, and to allow interest. Under the terms of the policy this

date could be no earlier than the date that payment of the $20,000 was made to the plaintiff by the liability carrier for the other driver.[3]

An award of prejudgment interest is proper where damages are liquidated or reasonably ascertainable. See *Turcotte v. Estate of LaRose*, 153 Vt. 196, 199, 569 A.2d 1086, 1088 (1989); *Estate of Sawyer v. Crowell*, 151 Vt. 287, 295, 559 A.2d 687, 692 (1989); V.R.C.P. 54(a). After payment by the tortfeasor's carrier, interest on amounts owing under UM coverage should begin to run when the liability of the uninsured or underinsured motorist has been established and the covered person's damages determined by judgment or an arbitration award. *Horace Mann Ins. Co. v. Ammerman*, 630 F. Supp. 114, 119–20 (D. Kan. 1986); *Smith v. Allstate Ins. Co.*, 483 A.2d 344, 347 (Me. 1984); *Palmer v. Farmers Ins. Exchange*, 233 Mont. 515, 526, 761 P.2d 401, 409 (1988); *Lyon v. Hartford Accident & Indem. Co.*, 25 Utah 2d 311, 318–19, 480 P.2d 739, 745 (1971). In *Horace Mann*, the court held that the interest on the judgment against the UM carrier began to accrue on the date "the Kansas state court found that Mrs. Chadwick was liable to defendants in the amount of $200,000.00. In conjunction with plaintiff's [UM carrier's] knowledge that Mrs. Chadwick's insurance coverage had been exhausted, this judgment placed plaintiff on notice of its potential liability in the amount of $200,000.00." 630 F. Supp. at 120.

■ It may well be that the covered person is entitled to payment of the UM coverage before a judgment or an arbitration award against the tortfeasor where the tortfeasor's liability is clear and the total damages clearly exceed the UM coverage or are otherwise readily ascertainable. In such cases, after payment by the underinsured motorist's carrier, prejudgment interest should be awarded from the date when the insurer has no right to consider an amount then owed to an insured as its own.

---

[3] III. Underinsured Motorists Coverage

. . . .

We will pay under this coverage only after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

It then retains that amount for the benefit of the insured. See *Higgins v. J.C. Penney Casualty Ins. Co.*, 413 N.W.2d 189, 192 (Minn. 1987) (trial court did not err in calculating prejudgment interest from the date insurer first had knowledge of its liability for underinsured motorist benefits on behalf of insured).

The interest awarded in the trial court was calculated from the date of accident and cannot stand by virtue of the policy provision. The matter must be remanded to ascertain when the plaintiff received payment of the settlement amount from the other driver's carrier and when after that date USF&G became legally obligated to pay its underinsured motorist's coverages.[4] Prejudgment interest should be awarded from that date.

*Reversed on the question of prejudgment interest and remanded to the trial court for determination of the correct amount of prejudgment interest in accordance with the views expressed in this opinion. The judgment of the trial court is otherwise affirmed.*

[4] It may be assumed that USF&G concluded at some point that it was obligated to pay the full amount of its available coverage from the fact that it prepared the judgment order calling for such payment without any judicial determination that the full amount was owing.