500 S.E.2d 310

John Paul MILLER, Plaintiff below, Appellee,

v.

Aaron P. FLUHARTY and Susan Fluharty, Defendants below,

and

State Farm Mutual Automobile Insurance Company, an insurance company, and William Wilson, individually and in the capacity of an agent of State Farm Mutual Automobile Insurance Company, Defendants below, Appellants.

No. 23993.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 9, 1997.

Decided Dec. 16, 1997.

Dissenting Opinion of Justice Maynard Dec. 19, 1997.

David J. Romano, Law Offices of David J. Romano, Clarksburg, for the Appellee.

Catherine D. Munster, James A. Varner, Gregory H. Schillace, McNeer, Highland, McMunn & Varner, Clarksburg, for the Appellants.

STARCHER, Justice:

This appeal from the Circuit Court of Harrison County concerns an action by a policyholder against his insurance carrier to recover attorney's fees, costs, and prejudgment interest for litigation over the proceeds of an underinsured motorist policy. The circuit court granted summary judgment to the policyholder and plaintiff-appellee, John Paul Miller, holding that Mr. Miller substantially prevailed in an action against his insurance company, defendant-appellant State Farm Mutual Automobile Insurance Company ("State Farm"). The circuit court awarded the plaintiff his attorney's fees and litigation expenses, as well as prejudgment interest on those fees and expenses.

After carefully reviewing the record, briefs and exhibits filed by the parties, we affirm the circuit court's grant of summary judgment to the plaintiff, and pursuant to our holding in *Hayseeds, Inc. v. State Farm Fire & Cas.*, 177 W.Va. 323, 352 S.E.2d 73 (1986), we affirm the award of attorney's fees and expenses. However, we reverse and set aside the award of prejudgment interest.

1. The Fluhartys have settled all claims with the plaintiff.

2. The adjuster, William Wilson, was sued individually and as an agent of State Farm for bad faith.

## I.

### *Facts and Background*

On September 3, 1994, the then 18–year-old plaintiff was a front-seat passenger in a vehicle owned by Sharon Fluharty, and driven by Ms. Fluharty's then 17–year-old son, Aaron Fluharty.[1] The record indicates that Aaron Fluharty lost control of the vehicle while driving at high speed and slid off of the road, hitting a hill and flipping the vehicle onto its roof.

The record suggests that, in the accident, the plaintiff's hand may have gone through the passenger side window and dragged along the pavement. The plaintiff sustained several broken fingers and torn tendons; he required multiple reconstructive surgeries to repair the damage to his right hand, accompanied by substantial amounts of rehabilitative therapy. He ultimately lost the tip of his right little finger. The accident also caused injuries to the nerves of the plaintiff's right hand, leaving the plaintiff with intermittent pain which interferes with the use of his hand.

Defendant State Farm issued two automobile insurance policies potentially covering the plaintiff's injuries. The first policy is a $100,000.00 liability insurance policy purchased by the Fluhartys, which included $5,000 in medical payments coverage. The second insurance policy, at issue in this appeal, is an underinsured motorist policy issued to the plaintiff's family, also with a $100,000.00 limit. This policy provided $10,000 in medical payments coverage.

Within one week of the accident, an adjuster for State Farm[2] wrote to the plaintiff (who had not yet hired an attorney) advising the plaintiff that he was entitled to $5,000.00 medical coverage benefits under "State Farm's applicable insurance policy,"[3] and that his "underinsured motorist coverage may be applicable." The letter requested that the plaintiff sign and return an enclosed medical authorization, thereby allowing State

3. This statement about medical coverage apparently referred to the Fluhartys' automobile insurance policy. The letter did not advise the plaintiff that he also had $10,000.00 in medical payments coverage available under the Millers' State Farm automobile insurance policy.

Farm to obtain copies of any of the plaintiff's medical records. It appears that the plaintiff signed and returned this form, and that State Farm later used this medical authorization to request copies of the plaintiff's medical records from his medical providers.

By December, 1994 the plaintiff had retained an attorney to represent him in his dealings with State Farm. Shortly thereafter, the plaintiff's attorney requested that State Farm execute an agreement to protect the confidentiality of the plaintiff's medical records. This confidentiality agreement would allow State Farm, its attorneys, physicians or any other representative to use the records for any purposes related to the plaintiff's case; however, the agreement prohibited State Farm from disseminating or computerizing the medical records for any other use, and required State Farm to destroy the records at the conclusion of the case. The plaintiff's attorney refused to forward copies of any of the plaintiff's medical records to State Farm without an agreement on confidentiality. The attorney stated that if the agreement was not signed, then a lawsuit would be filed to force the implementation of the confidentiality provisions of the proposed agreement.

State Farm, by letter dated February 1, 1995, refused to enter into any confidentiality agreement, stating that it was "aware of no sound legal basis which entitles your client(s) to a Confidentiality Agreement in order to provide medical records."

The plaintiff filed this lawsuit against the Fluhartys and State Farm on March 15, 1995. The plaintiff alleged that Aaron Fluharty had proximately caused the plaintiff's injuries through negligent or reckless conduct.[4] Furthermore, the complaint alleged that because State Farm refused to agree to protect the confidentiality of the plaintiff's medical records, State Farm had breached its duty to deal fairly and in good faith. The plaintiff sought damages from State Farm under theories of common-law and statutory bad faith for its conduct concerning the Fluhartys' liability policy.[5]

On August 4, 1995, the circuit court held a scheduling conference which was attended by counsel for the plaintiff, counsel for the Fluhartys, and an attorney representing State Farm. At that hearing the circuit court ordered that "[i]f any of the defendants wish[ed]" to have a medical examination performed on the plaintiff, that examination had to be completed by December 15, 1995. All discovery was to be completed by May 31, 1996; trial was scheduled for the week of July 8, 1996.

It appears that at the August 1995 scheduling conference, the plaintiff asked the circuit court to enter an order protecting the confidentiality of the plaintiff's medical records. After receiving briefs from the parties, on January 16, 1996 the circuit court entered a 14–page protective order[6] which required the plaintiff to sign an authorization for the release of medical records, but which also required State Farm to keep confidential all

4. When an uninsured or underinsured defendant motorist is sued, West Virginia law requires a policyholder intending to rely upon uninsured or underinsured motorist insurance coverage to serve a copy of the summons and complaint upon the insurance company providing the coverage sought as though the insurance company were a named party defendant. The insurance company then may file pleadings and take any action in the name of the uninsured or underinsured defendant. *See W.Va.Code*, 33–6–31(d) [1995]; Syllabus Point 1, *Postlethwait v. Boston Old Colony Ins. Co.*, 189 W.Va. 532, 432 S.E.2d 802 (1993). However, the insurance carrier, if it so chooses, is entitled to appear and defend in its own name. Syllabus Point 4, *State ex rel. State Farm Mut. Auto. Ins. Co. v. Canady*, 197 W.Va. 107, 475 S.E.2d 107 (1996). State Farm does not dispute that it received a copy of the complaint with the allegations against the Fluhartys,

nor does it dispute that these allegations were sufficient to put State Farm on notice that its obligations under the plaintiff's underinsured motorist policy were triggered.

5. By order dated August 4, 1995, the trial court bifurcated the bad faith claims from the negligence action. *See State ex rel. State Farm Fire & Cas. Co. v. Madden*, 192 W.Va. 155, 451 S.E.2d 721 (1994).

6. On October 13, 1995, counsel for the Fluhartys took the plaintiff's deposition. At this deposition, the plaintiff's attorney produced copies of the plaintiff's medical records and bills pursuant to a subpoena duces tecum. The plaintiff's attorney noted that the circuit court had previously orally ordered that State Farm preserve the confidentiality of the plaintiff's records.

medical information it obtained regarding the plaintiff. The circuit court found that "the Defendants are entitled to the information, some of which will most probably be totally irrelevant, but that upon obtaining this information the Defendants are restricted in how they use it and to whom they disseminate the information...."

On February 14, 1996, counsel for the plaintiff demanded that State Farm pay the limits of both the Fluhartys' liability policy and the plaintiff's underinsured motorist policy. Thereafter negotiations took place between a claims representative for State Farm and the plaintiff's attorney, and on February 23, 1996 the claims representative wrote that State Farm "very much" wanted to settle the liability insurance claim against the Fluhartys for the liability policy limits of $100,000.00. On March 6, 1996, State Farm officially offered the policy limits of the Fluhartys' liability policy to the plaintiff, an offer which was accepted the next day. However, the plaintiff reserved his right to pursue the $100,000.00 in proceeds available through his underinsured motorist policy.

Four days after the Fluharty settlement, on March 11, 1996, it appears that for the first time counsel *for the Fluhartys*, apparently acting on behalf of State Farm, wrote a letter requesting that a physician be allowed to conduct a medical examination of the plaintiff. The plaintiff's attorney objected to this examination because the request was made three months after the circuit court's December 15, 1995 deadline for such an examination, and the plaintiff's attorney's confusion as to why the Fluhartys' counsel was making the request.[7] It appears that the examination was never conducted.

The next day, March 12, 1996, counsel for the plaintiff wrote to counsel for State Farm again demanding payment of the $100,000.00 limit of the plaintiff's underinsured motorist policy, and stating that if the policy proceeds were not paid within 15 days,[8] he would also seek attorney's fees and costs.

On March 25, 1996, counsel for State Farm, G. Thomas Smith, wrote to the plaintiff offering an additional $30,000.00 to settle the underinsured motorist claim. In his letter, attorney Smith accused the plaintiff of "attempt[ing] to keep State Farm in the dark" by not providing all of the plaintiff's medical records, and Smith asked the plaintiff's attorney to provide the "remaining medical records." The letter also requested, as an alternative, that the plaintiff sign an "additional" medical records release.

The plaintiff refused State Farm's $30,-000.00 offer on April 3,1996, and said that the plaintiff would seek to recover full underinsured motorist coverage through court proceedings. The plaintiff indicated that State Farm had "available to it all of the discovery mechanisms to do whatever it deemed necessary to evaluate this case," such as depositions or expert reviews of the plaintiff's medical records, but indicated that State Farm had refused to use these avenues. The plaintiff stated that if State Farm had failed to obtain any of the plaintiff's medical records, "it has failed to do so through its own fault."

In response, on April 22, 1996 attorney Smith wrote to the plaintiff's attorney saying that he only "represent[ed] State Farm in this matter to the extent that you have alleged bad faith and/or violations of the Un-

7. Plaintiff's counsel, during the settlement process, repeatedly expressed uncertainty over which lawyer or claims representative was negotiating on State Farm's behalf. It appears that five separate law firms represented State Farm's interests in this action: one firm represented the Fluhartys; one firm represented State Farm in the bad faith claims concerning the liability policy; one firm appears to have represented State Farm in a generic sense, partially on the bad faith and unfair trade practice matters and partially on the underinsured motorist coverage dispute with the plaintiff; and the last firm, apparently retained in March 1996, represented State Farm solely in the underinsured motorist cover-

age dispute. A fifth law firm is representing State Farm in this appeal.

8. Title 114, series 14 of the *West Virginia Code of State Regulations ("CSR")* establishes certain minimum standards and methods of settlement for both first- and third-party insurance claims. The violation of these standards can constitute an unfair trade practice under *W.Va.Code*, 33–11–1 to –10. 114 *CSR* 14.5, cited by the plaintiff in his letter, requires insurers to acknowledge, within 15 days, the receipt of any communication by a claimant which reasonably apprises the insurance carrier of an occurrence which might give rise to liability under an insurance policy.

fair Trade Practices Act." Smith indicated that a new attorney would be filing an appearance "on behalf of State Farm as the underinsured carrier," and stated that all future correspondence relating to the underinsured motorist policy should be directed to the new attorney. Smith noted that the plaintiff had not provided State Farm with a medical authorization or any of the "requested items," and said that State Farm could not determine whether a medical examination was "necessary or warranted at this point."

Subsequently, on May 24, 1996, the new attorney representing State Farm in the underinsured motorist coverage dispute filed a notice of appearance with the circuit court. That same day, the new attorney filed a notice of deposition for the plaintiff's treating physician, Dr. Gregg M. O'Malley; the deposition was originally scheduled for May 30, 1996 (one day before the cut-off date for discovery), but was postponed by agreement to a later date.

Documents in the record indicate that the plaintiff and State Farm settled all bad faith claims on June 12, 1996, leaving only the claim for underinsured motorist benefits to be resolved. Four days later, on June 16, 1996, counsel for State Farm took the deposition of Dr. O'Malley. The next day, State Farm tendered, and the plaintiff accepted, the $100,000.00 limits of the plaintiff's underinsured motorist policy. However, in the settlement release, the plaintiff specifically reserved the right to pursue attorney's fees and costs for the litigation regarding underinsured motorist benefits.

Both parties submitted motions for summary judgment to the circuit court on the issue of whether the plaintiff had substantially prevailed in the litigation regarding the underinsured motorist policy, and therefore, whether the plaintiff was entitled to reimbursement of his reasonable attorney's fees and costs. On September 6, 1996, the circuit court granted summary judgment to the plaintiff, finding that State Farm "refused or failed" to evaluate the plaintiff's underinsured motorist claim, and ordered State Farm to pay to the plaintiff $33,333.00 in

attorney's fees and $1,766.80 in costs, plus prejudgment interest on those fees and costs.

## II.

### *Discussion*

State Farm appeals the circuit court's summary judgment order on two grounds. First, State Farm contends that the plaintiff failed to prove he "substantially prevailed" in his action to recover the proceeds of his underinsured motorist policy because he failed to make a demand against that policy before he filed a lawsuit. Therefore, State Farm argues that summary judgment should not have been granted to the plaintiff, but instead, should have either been granted to State Farm, or alternatively, denied altogether because the record contains disputed issues of fact as whether State Farm "wrongfully" or "unreasonably" delayed payment. Second, State Farm challenges the award of prejudgment interest to the plaintiff, and contends that prejudgment interest in excess of the limits of an insurance policy may never be recovered.

### A.

#### *Summary Judgment on Whether the Plaintiff Substantially Prevailed*

As we stated in Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), we review a circuit court's entry of summary judgment under *W.Va.R.Civ.P.* Rule 56 [1978] *de novo*. The traditional standard for granting summary judgment was established in Syllabus Point 3 of *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963) where we held:

> A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.

*In accord,* Syllabus Point 1, *Fayette County Nat. Bank v. Lilly,* 199 W.Va. 349, 484 S.E.2d 232 (1997); Syllabus Point 1, *Williams v. Precision Coil, Inc.,* 194 W.Va.

52, 459 S.E.2d 329 (1995); Syllabus Point 2, *Painter, supra.*

We begin by examining the duties of an insurance carrier towards a policyholder who has purchased an uninsured or underinsured motorist policy, or any other type of first-party insurance policy, and who has sustained a loss covered by that policy.

■ An underinsured motorist insurance policy, such as the one purchased by the plaintiff in this case, is "first party" insurance which is required to be offered to liability insurance policyholders by law. *See W.Va.Code,* 33–6–31(b) [1995]. "First party insurance means that the insurance carrier has directly contracted with the insured to provide coverage and to reimburse the insured for his or her damages up to the policy limits." *Marshall v. Saseen,* 192 W.Va. 94, 100, 450 S.E.2d 791, 797 (1994). The relationship between the policyholder and the insurance carrier arises from a mutual exchange of consideration, *i.e.,* the payment of premiums in exchange for underinsured motorist coverage, with the performance of the parties controlled by the written terms and conditions contained in the insurance policy.[9]

■ An underinsured motorist insurance policy is activated when the amount of a tortfeasor's motor vehicle liability insurance actually available to an injured policyholder is less than the total amount of damages sustained by the policyholder, regardless of the comparison between such liability insurance limits actually available and the underinsured motorist coverage limits. Syllabus Point 5, in part, *Pristavec v. Westfield Ins. Co.,* 184 W.Va. 331, 400 S.E.2d 575 (1990). Underinsured motorist coverage is designed to compensate a policyholder, within policy limits, for damages not compensated by a tortfeasor's liability policy. As we stated in Syllabus Point 4 of *State Auto. Mut. Ins. Co.*

*v. Youler,* 183 W.Va. 556, 396 S.E.2d 737 (1990),

*W.Va.Code,* 33–5–31(b), as amended, on uninsured and underinsured motorist coverage, contemplates recovery, up to coverage limits, from one's own insurer, of full compensation for damages not compensated by a negligent tortfeasor who at the time of the accident was an owner or operator of an uninsured or underinsured motor vehicle. Accordingly, the amount of such tortfeasor's motor vehicle liability insurance coverage actually available to the injured person in question is to be deducted from the total amount of damages sustained by the injured person, and the insurer providing underinsured motorist coverage is liable for the remainder of the damages, but not to exceed the coverage limits.

When an insurance carrier refuses to pay any type of first-party claim (including a claim for underinsurance benefits), the policyholder may be compelled to participate in lengthy, costly litigation to recover the insurance policy proceeds. We noted in *Hayseeds, supra,* that the "disparity of bargaining power between [an insurance] company and [its] policyholder (often exacerbated by the dynamics of the settlement bureaucracy) make insurance contracts substantially different from other commercial contracts[.]" 177 W.Va. at 328, 352 S.E.2d at 78.[10] Because of this disparity, we stated that lawsuits between policyholders and their insurance carriers are "one of the prominent instances where the American rule concerning attorneys' fees works badly." *Id.*

■ We therefore held in *Hayseeds* that, if the first-party policyholder substantially prevails against the insurance carrier in litigation, the policyholder is entitled to recoup his or her consequential damages resulting

---

9. An insurance carrier may incorporate any terms, conditions and exclusions into an automobile insurance policy as may be consistent with the premiums charged, so long as the terms of the policy do not conflict with the spirit and intent of the uninsured and underinsured motorist statutes. *See, e.g., Adkins v. Meador,* 201 W.Va. 148, 494 S.E.2d 915 (1997); *Deel v. Sweeney,* 181 W.Va. 460, 383 S.E.2d 92 (1989).

10. This disparity is apparent in the fact that insurance companies spend over $1 billion annually in litigation battles against policyholders. *See* Eugene R. Anderson and Joshua Gold, *Recoverability of Corporate Counsel Fees in Insurance Coverage Disputes,* 20 Am.J.Tr.Ad. 1, 3 fn. 5 (1996).

from the insurance carrier's delay in the payment of the claim. We stated in Syllabus Point 1 of *Hayseeds, supra:*

> Whenever a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience.

Damages for aggravation and inconvenience "are not limited to damages associated with loss of use of the personal property but relate as well to the aggravation and inconvenience shown in the entire claims collection process." Syllabus Point 4, in part, *McCormick v. Allstate Ins. Co.*, 197 W.Va. 415, 475 S.E.2d 507 (1996).

■ We defined the term "substantially prevails" in Syllabus Point 1 of *Jordan v. National Grange Mutual Ins. Co.*, 183 W.Va. 9, 393 S.E.2d 647 (1990), when we said:

> An insured "substantially prevails" in a property damage action against his or her insurer when the action is settled for an amount equal to or approximating the amount claimed by the insured immediately prior to the commencement of the action, as well as when the action is concluded by a jury verdict for such an amount. In either of these situations the insured is entitled to recover reasonable attorney's fees from his or her insurer, as long as the attorney's services were necessary to obtain payment of the insurance proceeds.

The principles in *Hayseeds* and *Jordan* (cases involving first-party disputes over property insurance) were extended to first-party claims concerning uninsured and underinsured motorist coverage in *Marshall v. Saseen*, 192 W.Va. 94, 450 S.E.2d 791 (1994). In *Marshall* we restated the rule by saying that "[i]f the insurer declined to settle, and the insured was required to sue and then substantially prevailed, the insurer was liable for not just the verdict but also for attorneys fees and incidental damages." 192 W.Va. at 100, 450 S.E.2d at 797.

The policy underlying *Hayseeds, Jordan* and *Marshall* is that a policyholder buys an insurance contract for peace of mind and security, not financial gain, and certainly not to be embroiled in litigation.[11] The goal is for all policyholders to get the benefit of their contractual bargain: they should get their policy proceeds promptly without having to pay litigation fees to vindicate their rights. "We adopted this rule in recognition of the fact that, when an insured purchases a contract of insurance, he buys insurance— not a lot of vexatious, time-consuming, expensive litigation with his insurer." *Hayseeds*, 177 W.Va. at 329, 352 S.E.2d at 79.

■ To meet its contractual obligation to provide coverage to a policyholder, we believe that an insurance carrier has a duty to conduct a prompt investigation[12] of any claim made by the policyholder. The Legislature has, by statute, made it the public policy of West Virginia that the failure of an insurance carrier to conduct a prompt investigation of a policyholder's claim constitutes an unfair trade practice, particularly when it is done with such frequency as to indicate a general business practice. *See W.Va.Code*, 33–11–4(9) [1985].[13]

---

11. *See, e.g., Love v. Fire Ins. Exchange*, 221 Cal. App.3d 1136, 1147–48, 271 Cal.Rptr. 246, 252 (Cal.App. 4 Dist.1990) ("An insured does not enter into an insurance contract seeking profit, but instead seeks security and peace of mind through protection against calamity."); *Andrew Jackson Life Ins. Co. v. Williams*, 566 So.2d 1172, 1179 n. 9 (Miss.1990) ("[A]n insured bargains for more than mere eventual monetary proceeds of a policy; insureds bargain for such intangibles as risk aversion, peace of mind, and certain and prompt payment of the policy proceeds upon submission of a valid claim."); *Ainsworth v. Combined Ins. Co. of America*, 104 Nev. 587, 591–93, 763 P.2d 673, 676 (1988) ("A consumer buys insurance for security, protection, and peace of mind."); *Egan v. Mutual of Omaha Ins.*

*Co.*, 24 Cal.3d 809, 819, 169 Cal.Rptr. 691, 695, 620 P.2d 141, 145 (1979) ("The insured in a contract like the one before us does not seek to obtain a commercial advantage by purchasing the policy—rather, he seeks protection against calamity.")

12. A "prompt" investigation is one "performed readily or immediately," or involves "responding instantly." *See Allen v. State Human Rights Commission*, 174 W.Va. 139, 154, 324 S.E.2d 99, 115 (1984).

13. 114 *CSR* 14.6.1 requires insurance carriers to establish procedures to commence an investigation of any claim filed within 15 days of receipt

By law, it is an unfair trade practice for an insurer to fail to adopt standards for the "prompt investigation of claims arising under insurance policies." *W.Va.Code,* 33–11–4(9)(c) [1985]. It is also unfair for an insurance company to refuse to pay a claim "without conducting a reasonable investigation based upon all available information." *W.Va. Code,* 33–11–4(9)(d) [1985]. The Legislature has further established that it is an unfair trade practice for an insurance company to "not attempt[ ] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." *W.Va.Code,* 33–11–4(9)(f) [1985].

Other jurisdictions have, applying various forms of reasoning, also concluded that the failure by an insurance carrier to investigate a claim adequately, or to investigate a claim properly within a reasonable time, constitutes a breach of the insurance contract.[14] The Supreme Court of California stated the reason for such a duty in this manner:

> To protect [a policyholder's interest in peace of mind and security from the purchase of a policy] it is essential that an insurer fully inquire into possible bases that might support the insured's claim. Although we recognize that distinguishing fraudulent from legitimate claims may occasionally be difficult for insurers ... an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial.

*Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 695–96, 620 P.2d 141, 145–46 (1979). One commentator stated, in a review of cases on an insurance carrier's duty to investigate, that "[i]f an insurer withholds payment of a claim in a first-party case based on its understanding of the facts, it had better get its facts straight first." Ste-

phen S. Ashley, *Bad Faith Actions* § 5:08 (1984).

■ We therefore hold that an insurance carrier has a duty, once a first-party policyholder has submitted proof of a loss, to promptly conduct a reasonable investigation of the policyholder's loss based upon all available information. On the basis of that investigation, if liability to the policyholder has become reasonably clear, the insurance carrier must make a prompt, fair and equitable settlement offer. If the circuit court finds evidence that the insurance carrier has failed to properly or promptly investigate the policyholder's claim, then the circuit court may consider that evidence in determining whether the policyholder has substantially prevailed in an action to enforce the insurance contract.

In light of these principles, we now evaluate State Farm's arguments why the plaintiff's motion for summary judgment should have been denied, and why summary judgment should have either been granted to State Farm or denied altogether.

State Farm contends that before a policyholder can recover attorney's fees and costs from an insurance carrier under *Hayseeds,* the policyholder must show that he made a demand to settle the claim *prior* to the filing of a lawsuit. State Farm argues that because the plaintiff waited until after he filed his lawsuit against the Fluhartys to make a demand against his underinsured motorist policy, he is precluded from recovering attorney's fees, costs and other consequential damages resulting from litigation over State Farm's non-payment of the underinsured motorist policy proceeds.

Alternatively, State Farm argues that questions of fact exist over whether any delay in payment of the policy proceeds by State Farm was primarily the plaintiff's fault.

of notice of the claim. 114 *CSR* 14.6.5 states that an insurance carrier must notify a first-party claimant in writing within 15 days of receipt of proof of loss that more time is needed to "determine whether a first party claim should be accepted or denied.... If the investigation remains incomplete, the insurer shall send to such claimant within thirty (30) calendar days from the date of the initial notification and every thirty (30) calendar days thereafter, a letter setting

forth the reason additional time is needed for investigation."

14. By our count at least 33 jurisdictions hold that the failure of an insurance carrier to promptly perform a competent investigation of a policyholder's claim constitutes a breach of the insurance contract. *See* Stephen S. Ashley, *Bad Faith Actions* § 5:08 (1984), footnote 1.

State Farm argues that the facts show that any delay in resolving the claim was the result of the plaintiff's insistence on the confidentiality of his medical records [15]—and did not result from State Farm's failure to investigate the plaintiff's claim through available discovery devices. Additionally, State Farm argues that questions of fact exist over whether State Farm "unreasonably" or "wrongfully" delayed payment.

We reject both of State Farm's positions.

■ First, we agree with State Farm that in the factual situation of *Hayseeds*, and in subsequent cases decided under *Hayseeds*, a pre-suit demand had been made. However, none of our prior cases has hinged on a requirement that a first-party policyholder make a demand on the insurance carrier prior to the initiation of litigation. Instead, the public policy established in *Hayseeds* and its progeny is to encourage the speedy payment on the policyholder's insurance contract, regardless of when and how the policyholder makes a claim.[16] We can discern no reason why a policyholder who makes a pre-suit demand should be protected from his own insurance carrier's delay, while a similarly situated policyholder who makes a post-suit demand should not.

■ Accordingly, when examining whether a policyholder has substantially prevailed against an insurance carrier, a court should look at the negotiations as a whole from the time of the insured event to the final payment of the insurance proceeds. If the policyholder makes a reasonable demand during the course of the negotiations, within policy limits, the insurance carrier must either meet that demand, or promptly respond to the policyholder with a statement why such a demand is not supported by the available information. The insurance carrier's failure to promptly respond is a factor for courts to consider in deciding whether the policyholder has substantially prevailed in enforcing the insurance contract, and therefore, whether the insurance carrier is liable for the policyholder's consequential damages under *Hayseeds, supra,* and its progeny.

We recognize that our holding today conflicts with the language of several of our prior opinions. Accordingly, to the extent that Syllabus Point 1 of *Jordan v. National Grange Mut. Ins. Co.,* 183 W.Va. 9, 393 S.E.2d 647 (1990); Syllabus Point 2 of *Thomas v. State Farm Mut. Auto. Ins. Co.,* 181 W.Va. 604, 383 S.E.2d 786 (1989);[17] and Syllabus Point 1 of *Hayseeds, Inc. v. State Farm Fire & Cas.,* 177 W.Va. 323, 352 S.E.2d 73 (1986), and cases relying upon *Hayseeds,* imply a requirement that, in order to recover consequential damages for an insurance carrier's delay, a first-party policyholder must make a demand against his or her insurance carrier prior to initiating litigation against a third-party tortfeasor, those cases are hereby modified. Whether a policyholder has substantially prevailed is determined by looking at the totality of the policyholder's negotiations with the insurance carrier, not merely the status of negotiations before and after a lawsuit is filed.

■ Second, it is apparent from the record in this case that State Farm did not conduct a prompt, thorough investigation of the plaintiff's claim for benefits under his underinsured motorist policy. Aside from

---

15. The parties also vigorously dispute whether a plaintiff can insist on the confidentiality of his or her medical records. We do not reach the merits of this issue as the question is not directly implicated by the facts in this case.

16. Under *Hayseeds,* the policyholder's consequential damages are based upon the insurance carrier's delay in settlement; the damages do not begin to accrue until after the insurance carrier is on notice that the policyholder is making a claim. Hence, if the first notice that an insurance carrier has of a claim is the filing of a lawsuit, then that is the date the insurance carrier's duty to promptly investigate the claim begins.

17. Syllabus Point 2 of *Thomas* states:

The question of whether an insured has substantially prevailed against his insurance company on a property damage claim is determined by the status of the negotiations between the insured and the insurer prior to the institution of the lawsuit. Where the insurance company has offered an amount materially below the damage estimates submitted by the insured, and the jury awards the insured an amount approximating the insured's damage estimates, the insured has substantially prevailed.

asking that the plaintiff provide State Farm with copies of records on his medical condition, the record indicates that State Farm failed to conduct a full investigation of the plaintiff's claim for benefits under his underinsured motorist policy until May 1996, 14 months after the lawsuit was filed, but less than one month before settling.

There is nothing to suggest that State Farm requested medical records from the plaintiff's medical providers as it was allowed to do under the circuit court's confidentiality order of January 16, 1996. It appears that the extent of State Farm's investigation was, 18 months after the accident, to demand that the plaintiff pay to obtain copies of his own medical records and provide those to State Farm for its evaluation. While it appears that State Farm already had in its possession many of the plaintiff's medical records, it was not until March 25, 1996 that the attorney for State Farm asked the plaintiff's attorney for an "additional" authorization to obtain additional medical records.

Furthermore, State Farm did not seek to have the plaintiff examined by a physician of its own choosing, paid for from its own funds, prior to December 15, 1995, pursuant to the circuit court's scheduling order. State Farm declined to even suggest that such an examination be performed until nearly three months after the circuit court's deadline,[18] and seven weeks later State Farm admitted that it could not determine whether a medical examination of the plaintiff was "necessary or warranted at this point." Also, State Farm never sought relief from the scheduling order at any time thereafter.

More importantly, it was not until two months after the plaintiff demanded the limits of the underinsured motorist policy, and over 13 months after the plaintiff filed his lawsuit, that State Farm even hired an attorney to represent it solely on the underinsured motorist coverage dispute. State Farm's new attorney did not note his appearance with the trial court until May 24, 1996, one week before the expiration of the discovery period. It was at this time that the new attorney began to aggressively investigate the plaintiff's claim and attempt to question or depose the plaintiff's physicians.

State Farm's actions in this case are similar to those in *Hayseeds, supra,* where we found that even though the policyholder had authorized the insurance carrier to obtain records which would support the policyholder's position, the insurance carrier "did not undertake a complete examination" of the policyholder's position. 177 W.Va. at 326, 352 S.E.2d at 77. In the instant case State Farm finally investigated the plaintiff's claims in June 1996, and offered the balance of the plaintiff's underinsured motorist policy the day after taking the plaintiff's physician's deposition. The award of attorney's fees and costs is warranted in this case because State Farm could and should have performed such an investigation many months earlier, at its own expense, without compelling the plaintiff to participate in litigation.

 Another argument posed by State Farm is that a first-party insurance carrier should only be required to pay a policyholder's attorney's fees and costs when they are necessitated by "wrongful withholding" or "unreasonable delay" in the payment of the policyholder's claim. It appears that State Farm's argument is based on our one-sentence discussion in *dicta* in *Hayseeds* of the approach other jurisdictions take to first-party insurance disputes, where we stated:

> It is now the majority rule in American Courts that when an insurer wrongfully withholds or unreasonably delays payment of an insured's claim, the insurer is liable for all foreseeable, consequential damages naturally flowing from the delay. *See,* Annot. 47 A.L.R.3d 314 (1973).

177 W.Va. at 330, 352 S.E.2d at 80.

However, in *Hayseeds* we went on to clearly reject any requirement that a policyholder prove an insurance carrier acted "wrongfully" or "unreasonably" in its delay of payment before recovering consequential damages. We said:

---

18. We also do not understand why the attorney representing the Fluhartys requested this medical examination by letter dated March 11, 1996,

when the record indicates the plaintiff had accepted the Fluhartys' settlement offer on March 7, 1996.

Unfortunately, awards of consequential damages [in other jurisdictions] currently turn on judicial interpretation of such malleable and easily manipulated concepts as "reasonable," "unreasonable," "wrongful," "good faith," and "bad faith." We believe that the interests of both the parties and the judicial system would be better served by the enunciation of a clear, bright line standard governing the availability of consequential damages in property damages insurance cases. Accordingly, we hold today that when a policyholder substantially prevails in a property damage suit against an insurer, the policyholder is entitled to damages for net economic loss caused by the delay in settlement, as well as an award for aggravation and inconvenience.

177 W.Va. at 330, 352 S.E.2d at 80. Our cases do not require a policyholder to prove a particular form of "bad" conduct by an insurance carrier. As we said in *Hayseeds:*

> [W]e consider it of little importance whether an insurer contests an insured's claim in good or bad faith. In either case, the insured is out his consequential damages and attorney's fees.

> To impose upon the insured the cost of compelling his insurer to honor its contractual obligation is effectively to deny him the benefit of his bargain.

> Accordingly, we hold today that whenever a policyholder must sue his own insurance company over any property damage claim, and the policyholder substantially prevails in the action, the company is liable for the payment of the policyholder's reasonable attorneys' fees. Presumptively, reasonable attorneys' fees in this type of case are one-third of the face amount of the policy, unless the policy is either extremely small or enormously large.

177 W.Va. at 329–330, 352 S.E.2d at 79–80.

■ Our "bright-line" standard is clear: once a demand is unmet by an insurance carrier, a policyholder need only prove he or she has substantially prevailed. Once that is proven, the policyholder is entitled to recover his or her attorney's fees, consequential damages and other net economic losses caused by the delay in settlement, as well as damages for aggravation and inconvenience.

State Farm argues that if a policyholder is not required to prove the insurance carrier's actions were "wrongful" or "unreasonable," then every insurance carrier might as well pay the policyholder the limits of the policy the moment a demand is made (causing insurance costs to skyrocket), or gamble and go to trial with every claim made. State Farm contends that every potential plaintiff will obstruct settlement negotiations with his or her own insurer, will intentionally delay settlement, and will then later demand the payment of the limits of the first-party policy plus attorney's fees and costs.

We disagree with this position because, in order to substantially prevail, a policyholder must first make a reasonable demand within the policy limits. If a first-party insurance carrier refuses to meet a policyholder's reasonable demands and goes to trial, then the insurance carrier faces the possibility of paying the policy limits plus the policyholder's attorney's fees, litigation costs, and other *Hayseeds*-type consequential damages. In addition, as we said in Syllabus Point 7 of *Marshall v. Saseen, supra,* the insurance carrier may become liable for any verdict in excess of the policy limits if the insurance carrier failed to exercise good faith in the settlement process.[19] Further, as we discuss below, the insurance carrier may become liable for prejudgment interest as well. By promptly tendering the amount reasonably demanded by the policyholder, the insurance carrier can obtain a release for its prior conduct which triggers claims for attorney's fees, costs and consequential damages under *Hayseeds*, claims for prejudgment interest, and claims for bad faith damages under *Marshall.*

---

**19.** Syllabus Point 7 of *Marshall v. Saseen,* 192 W.Va. 94, 450 S.E.2d 791 (1994) states:

> Where an uninsured or underinsured motorist insurance carrier fails to settle within its policy limits, it may be liable in a separate suit for the excess verdict returned by a jury for its failure to make a good faith settlement within its policy limits under the principles set out in *Shamblin v. Nationwide Mutual Insurance Co.,* 183 W.Va. 585, 396 S.E.2d 766 (1990).

To be clear, however, we do not mean by our statements today that an insurance carrier is required to pay the limits of any insurance policy the moment a policyholder makes a claim. In this case, State Farm limited its investigation of the plaintiff's claim, thereby delaying payment of the claim. There is no doubt that an insurance carrier is allowed a certain amount of time to investigate and process a claim, at its own expense, but once it becomes clear that the benefits are due, delaying payment is often the same as not paying at all.

The public policy set forth in *W.Va.Code*, 33–11–4(9) [1985] is that an insurance carrier has a duty to promptly conduct its own investigation, at its own expense, when a policyholder submits proof of a loss. The insurance carrier becomes liable for consequential damages when it delays the settlement of a proper claim where liability is reasonably clear. When a policyholder substantially prevails in a lawsuit to pursue the policy proceeds, a court may presume that the liability of the insurer was reasonably clear. Any consequential damages incurred by the policyholder because of the insurance carrier's delay, such as attorney's fees, litigation costs, and the aggravation and inconvenience which can accompany a dispute with an insurance company, become the liability of the insurance carrier and not the policyholder.

▪ Settlement negotiations regarding a first-party policy are, of course, built on a two-way street. As we said in *Hadorn v. Shea*, 193 W.Va. 350, 354, 456 S.E.2d 194, 198 (1995), "[i]t takes two to negotiate[.]" For a policyholder to recover reasonable attorney's fees from an insurance carrier, there must be proof "the attorney's services were necessary to obtain payment of the insurance proceeds." Syllabus Point 1, in part, *Jordan v. National Grange Mut. Ins. Co., supra.* As we stated above, an insurance carrier has a duty to promptly investigate claims made by its policyholders, and to promptly attempt a fair resolution of those claims based upon all of the available information. However, if an insurer has met its burden of making a reasonable offer based upon *all* of the available information, and the insurer has explained its reluctance to meet the policyholder's de-

mand, the policyholder must attempt to justify his or her initial demand, or change the demand to conform to the available information; otherwise, as in *Hadorn, supra,* the policyholder may be unable to show that "but for" an attorney's services, he or she would not have been able to get the insurance carrier to settle before trial, and will not be entitled to reimbursement from the insurance carrier for the attorney's fees.

▪ In this case it is unquestionably clear that the plaintiff substantially prevailed. State Farm settled for the exact amount demanded by the plaintiff, albeit four months after the plaintiff's demand. State Farm argues that the time lapse was inconsequential, but we conclude otherwise. In those intervening months, the plaintiff was forced to conduct depositions, settlement negotiations, prepare for trial, and generally engage in litigation that he would not have had to do if State Farm had promptly met its contractual and statutory responsibilities.

The circuit court found that no material issues of fact remained for jury resolution, and we agree with the circuit court's conclusion. State Farm gave (and still gives) no rationale as to why the $30,000.00 offer it made in March 1996 was a fair offer under the circumstances. Further, State Farm offered no affidavits in support of its position. We cannot see how the circuit court or a jury could have concluded that State Farm had promptly investigated the plaintiff's claims. We agree with the circuit court's holding that:

> [I]t is unlikely that any affidavit which State Farm could provide would persuade the Court that State Farm's inability to evaluate the Plaintiff's injuries, if in fact there was such an inability, was due to anything more than State Farm's refusal to obtain necessary information through the discovery procedures available to it in this case.

Accordingly, we affirm the circuit court's granting of summary judgment for the plaintiff, and the denial of summary judgment for State Farm.

## B.

### Prejudgment Interest

■ State Farm's second point of error is that the circuit court erred in granting the plaintiff prejudgment interest on the award of attorney's fees and costs. "In reviewing a circuit court's award of prejudgment interest, we usually apply an abuse of discretion standard.... However, when the award hinges, in part, on an interpretation of our decisional or statutory law, we review *de novo* that portion of the analysis." *Gribben v. Kirk,* 195 W.Va. 488, 500, 466 S.E.2d 147, 159 (1995).

■ To determine whether an award of prejudgment interest is appropriate, "we first must determine whether West Virginia law expressly allows or expressly forbids the inclusion of interest." *Id.* The awarding of prejudgment interest is governed by *W.Va. Code,* 56–6–31 [1981], which provides that if a "judgment or decree, or any part thereof, is for special damages, as defined below, or for liquidated damages, the amount of such special or liquidated damages shall bear interest from the date the right to bring the same shall have accrued...." The term "special damages" is defined as including "lost wages and income, medical expenses, damages to tangible personal property, and similar out-of-pocket expenses...." [20]

■ We defined the purpose of pre-judgment interest in Syllabus Point 1 of *Buckhannon–Upshur County Airport Authority v. R & R Coal Contracting, Inc.,* 186 W.Va. 583, 413 S.E.2d 404 (1991), stating that:

Prejudgment interest, according to West Virginia Code § 56–6–31 (1981) and the decisions of this Court interpreting that statute, is not a cost, but is a form of compensatory damages intended to make an injured plaintiff whole as far as loss of use of funds is concerned.

Prejudgment interest is a part of a plaintiff's damages awarded for ascertainable pecuniary losses, and serves "to fully compensate the injured party for the loss of the use of funds that have been expended." *Bond v. City of Huntington,* 166 W.Va. 581, 598, 276 S.E.2d 539, 548 (1981), *superseded by statute as stated in Rice v. Ryder,* 184 W.Va. 255, 400 S.E.2d 263 (1990).

■ In this case, we do not perceive the plaintiff's attorney's fees and litigation expenses to be ascertainable, pecuniary, out-of-pocket expenditures to the plaintiff that would support an award of prejudgment interest. *Cf. State ex rel. Chafin v. Mingo County Comm'n,* 189 W.Va. 680, 434 S.E.2d 40 (1993) (*per curiam*) (attorney's fees approved, but prejudgment interest not allowed on those fees).

First, we stated in *Hayseeds,* 177 W.Va. at 330, 352 S.E.2d at 80, that a circuit court may assess *reasonable* attorney's fees to the policyholder's attorney and against the insurance carrier. While a reasonable contingent attorney's fee is presumed to be one-third of the recovery (unless the face value of the policy is extremely small or enormously large), that amount is unliquidated and unsettled until the circuit court issues its ruling. Only after the circuit court approves the policyholder's attorney's fee does the amount become liquidated and established. Hence, prejudgment interest is not available, because the amount of the attorney's fee is not ascertainable until the circuit court issues its ruling.

Second, under *Hayseeds,* a circuit court may shift a policyholder's attorney's reasonable litigation expenses to the insurance carrier as well. However, in most cases, those litigation costs are not "out-of-pocket expen-

---

20. *W.Va.Code,* 56–6–31 [1981] states:

Except where it is otherwise provided by law, every judgment or decree for the payment of money entered by any court of this State shall bear interest from the date thereof, whether it be so stated in the judgment or decree or not: Provided, that if the judgment or decree, or any part thereof, is for special damages, as defined below, or for liquidated damages, the amount of such special or liquidated damages shall bear interest from the date the right to bring the same shall

have accrued, as determined by the court. Special damages includes lost wages and income, medical expenses, damages to tangible personal property, and similar out-of-pocket expenditures, as determined by the court.

The rate of interest shall be ten dollars upon one hundred dollars per annum, and proportionately for a greater or lesser sum, or for a longer or shorter time, notwithstanding any other provisions of law.

ditures" to the policyholder as is contemplated by *W.Va.Code*, 56–6–31, primarily because under a contingent fee agreement, the policyholder does not become responsible for these costs until after the insurance carrier pays the verdict or settlement.[21] Accordingly, a policyholder usually may not recover prejudgment interest on litigation expenses incurred by his attorney.

After reviewing the record in this case, we conclude that the circuit court erred in awarding the plaintiff prejudgment interest on his attorney's fees and costs. There is no evidence in the record that these fees and costs were "out-of-pocket expenditures" for which prejudgment interest could be awarded. Further, aside from the award of attorney's fees and costs, there was no judgment by the circuit court concerning the plaintiff's underinsured motorist benefits upon which prejudgment interest could be assessed; the policy benefits were paid as the result of a settlement. Accordingly, we reverse the circuit court's award of prejudgment interest.[22]

### III.

#### Conclusion

For the reasons set forth above, we affirm the circuit court's September 6, 1996 order granting summary judgment to the plaintiff, and affirm the award of attorney's fees and costs. However, we reverse and set aside the circuit court's award of prejudgment interest.

Affirmed in part, reversed in part.

MAYNARD, Justice, dissenting:

(Filed Dec. 19, 1997)

I strenuously dissent in this case because I believe that if a policyholder is not required to prove the insurance carrier's actions were wrongful or unreasonable, as this decision provides, every insurance carrier might as well pay the policyholder the limits of the policy the moment the demand is made. That is simply unfair and will cause insurance costs to skyrocket. The only other option for defendants such as these is to gamble and go to trial with every claim made. Further, I believe this decision will encourage every potential plaintiff to obstruct settlement negotiations with his or her insurance carrier, to intentionally delay settlement, then to later demand the payment of the limits of the first-party policy, plus attorney's fees and costs.

---

21. *Cf. Grove By and Through Grove v. Myers,* 181 W.Va. 342, 382 S.E.2d 536 (1989) where we held that prejudgment interest could be recovered on medical bills, even though those bills had not been paid by the time of trial. In *Grove* there was substantial evidence to show that the medical bills incurred by the plaintiff were personal obligations of the plaintiff by the time of trial, and by implication, the bills impacted upon the plaintiff's credit. 181 W.Va. at 350–51, 382 S.E.2d at 544–45. The litigation expenses of the plaintiff's attorney in this case do not have a similar, "out-of-pocket" impact on the plaintiff.

22. State Farm argues that an uninsured or underinsured motorist insurance carrier may *never* be liable for prejudgment interest that would result in the total payment by the insurance carrier exceeding the policy limits, citing Syllabus Point 3 of *State Farm Auto. Ins. Co. v. Agrippe,* 191 W.Va. 230, 445 S.E.2d 171 (1994) and Syllabus Point 4 of *Buckhannon–Upshur County Airport Authority v. R & R Coal Contracting, Inc.,* 186 W.Va. 583, 413 S.E.2d 404 (1991). We decline to address this argument.

We note, however, that other jurisdictions have approved an award of prejudgment interest in first-party insurance actions against an insurance carrier, even when that interest is in excess of policy limits. *See, e.g., Schimizzi v. Illinois Farmers Ins. Co.,* 928 F.Supp. 760 (N.D.Ind. 1996) (policyholder entitled to prejudgment interest when policyholder's damages, even though continuing and unresolved, exceeded underinsured motorist policy limits); *Webb v. U.S. Fidelity & Guar. Co.,* 158 Vt. 137, 144–145, 605 A.2d 1344, 1349 (1992) (insurance carrier liable for prejudgment interest from date insurance carrier has a duty to pay underinsured motorist benefits to policyholder); *Vasquez v. LeMars Mut. Ins. Co.,* 477 N.W.2d 404 (Iowa 1991) (trial court did not err in awarding policyholder prejudgment interest in excess of policy limits in a claim against underinsured motorist carrier); *Higgins on Behalf of Higgins v. J.C. Penney Cas. Ins. Co.,* 413 N.W.2d 189 (Minn.App.1987) (prejudgment interest was proper against underinsured motorist insurance carrier given that the nature and extent of the plaintiff's injuries clearly showed the underinsured motorist policyholder's injuries exceeded the tortfeasor's liability limits). This Court has also indirectly approved of an award of prejudgment interest on insurance policy proceeds in excess of the policy limits. *See Smithson v. U.S. Fidelity & Guar. Co.,* 186 W.Va. 195, 411 S.E.2d 850 (1991).

The majority opinion does what the law should never do. It punishes innocent parties. Insurance carriers who do *absolutely nothing wrong* will have to pay policyholders' attorneys' fees, consequential damages and other net economic losses, as well as damages for aggravation and inconvenience. It also denies insurance carriers their right to investigate and defend claims, which will encourage fraud and abuse.

Of course, the real losers here are purchasers of insurance who will have to pay even higher premiums in order to support the escalating insurance costs resulting from the majority opinion. Accordingly, I respectfully dissent.