**IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA**

Spring 2025 Term

_____

No. 24-ICA-320

_____

**FILED**

**June 13, 2025**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

TAMMY S. WRATCHFORD and MICHAEL W. WRATCHFORD,
Plaintiffs Below, Petitioners,

v.

ERIE INSURANCE PROPERTY & CASUALTY COMPANY,
Defendant Below, Respondent.

_____

Appeal from the Circuit Court of Hardy County, West Virginia
The Honorable H. Charles Carl, III, Judge
Civil Action No. CC-16-2018-C-3

AFFIRMED in part, REVERSED in part, and REMANDED with instructions
_____

Submitted:  April 30, 2025
Filed:  June 13, 2025

J. David Judy, III, Esq.
Judy & Judy Attorneys at Law
Moorefield, West Virginia
Counsel for Petitioners

Matthew J. Perry, Esq.
Jill E. Lansden, Esq.
Burns White, LLC
Huntington, West Virginia
Counsel for Respondent

_____

AND

_____

No. 24-ICA-331
_____

ERIE INSURANCE PROPERTY & CASUALTY COMPANY,
Defendant Below, Petitioner,

v.

TAMMY S. WRATCHFORD and MICHAEL W. WRATCHFORD,
Plaintiffs Below, Respondents.
_____

Appeal from the Circuit Court of Hardy County, West Virginia
The Honorable H. Charles Carl, III, Judge
Civil Action No. CC-16-2018-C-3

REVERSED and REMANDED with instructions
_____

Submitted:  April 30, 2025
Filed:  Filed:  June 13, 2025

Matthew J. Perry, Esq.                     J. David Judy, III, Esq.
Jill E. Lansden, Esq.                      Judy & Judy Attorneys at Law
Burns White, LLC                           Moorefield, West Virginia
Huntington, West Virginia                  Counsel for Respondents
Counsel for Petitioner

JUDGE GREEAR delivered the Opinion of the Court.

GREEAR, Judge:

Petitioners, Tammy and Michael Wratchford ("Petitioners") appeal five orders of the Circuit Court of Hardy County[1] relating to a number of post-trial rulings made by that court following a jury trial on Petitioners' underlying claims against Respondent Erie Property & Casualty Insurance Company ("Erie"). Separately, Erie appeals the circuit court's July 22, 2024, order denying Erie's Motion to Alter or Amend Judgment to Reduce the Award of Contractual Damages and to Vacate the Award of Non-Contractual Damages.

---

[1] Petitioners appeal the following orders:

1) February 2, 2024, Order Denying, in part, and Granting, in part, Motion for Prejudgment Interest and Post-Judgment Interest, and Denying Motion for New Trial on Prejudgment Interest.

2) March 18, 2024, Judgment Order.

3) July 22, 2024, Order Denying [Petitioners'] Motion and Supplemental Motion to Find that [Petitioners] "Substantially Prevailed" in the Property Damage Suit Against Erie and for Second Hayseeds Trial. ("July 22, 2024, Substantially Prevailed Order").

4) July 22, 2024, Order Denying [Petitioners'] Supplemental Motion for Judgment Notwithstanding [the] Verdict; Motion for [Judgment] Notwithstanding [the] Verdict on Damages; Motion for New Trial/Second Trial on Failure to Provide Non-economic Damages including Aggravation and Inconvenience under Hayseeds; Motion for New Trial on Prejudgment Interest and Economic Losses Resulting from Delay in Payment; Motion to Hold Prejudgment Interest as Non-final Adjudication (Interlocutory) of Damages and to Delay Appeal Time Pending second trial; and Motion for Post-Judgment Interest from the Date of Jury Verdict May 25, 2023 at 8% on March 27, 2024. ("July 22, 2024, Comprehensive Order")

5) July 22, 2024, Order Denying [Erie's] Motion to Alter or Amend Judgment [Order] to Reduce the Award of Contractual Damages and to Vacate the Award of Non-Contractual Damages.

1

Petitioners' and Erie's separate appeals were consolidated by this Court's February 12, 2025, order for the purpose of consideration and decision.[2]

On appeal, Petitioners contend that the circuit court erred in denying their post-trial motion requesting a finding that Petitioners "substantially prevailed" against Erie at the underlying trial, and further, that the court erred in denying their motion for new trial on *Hayseeds*[3] damages. Petitioners also appeal the circuit court's denial of their motions on other issues, including attorney's fees and expenses; prejudgment interest; judgment notwithstanding the verdict on trees, shrubs, plants, and lawn damages and mortgage interest; and judgment as a matter of law on their claims of Erie's violation of the West Virginia Unfair Trade Practices Act ("UTPA"). Based upon our review of the record, applicable law, and the written and oral arguments of counsel, we affirm each of the circuit court's rulings on the issues raised by Petitioners, with the exception of the circuit court's denial of Petitioners' motion for a finding that it "substantially prevailed" in its underlying claims against Erie and the associated award of reasonable attorney's fees and expenses, if any, to Petitioners. As to these exceptions, we find that the circuit court abused its discretion in finding that Petitioners did not "substantially prevail" at the trial below, based

---

[2] For clarification purposes, Petitioners will be referred to as "Petitioners" throughout this decision, even when this Court is discussing the issue raised by Erie on appeal.

[3] *See Hayseeds, Inc. v. State Farm Fire & Cas.,* 177 W. Va. 323, 352 S.E.2d 73 (1986).

2

upon the court's failure to consider the pre-litigation settlement negotiations between Petitioners and Erie in its decision regarding these motions. Thus, we remand this matter to the circuit court, only as to the "substantially prevailing" determination and the award of associated reasonable attorney's fees and expenses, and direct that the circuit court determine whether Petitioners "substantially prevailed" in their underlying claims against Erie, based upon the settlement negotiations of the parties "as a whole from the time of the insured event to the final payment of the insurance proceeds." *See Miller v. Fluharty*, 201 W. Va. 685, 689, 500 S.E.2d 310, 314 (1997)

In its appeal, Erie argues that the circuit court erred in failing to provide Erie with a credit or set-off to the contractual damages the jury awarded to Petitioners at trial, by the amount paid by Erie (prior to trial) in satisfaction of Petitioners' mortgage ($168,723.90). As to this issue, we find that the circuit court erred in its finding that Erie waived its claim for a set-off or credit in the requested amount based upon the court's interpretation of West Virginia Code §§ 56-5-4 and 56-5-5. We find these code sections do not operate to preclude Erie's request for a set-off or credit. Moreover, we find that evidence in the record clearly establishes that Erie preserved its request to seek a set-off or credit. Thus, given our findings that West Virginia Code §§ 56-5-4 and 56-5-5 are inapplicable and that Erie preserved its right to seek a set-off or credit, we reverse the circuit court's order denying's Erie's request for a credit or set-off, and remand this matter to circuit court for that court to conduct a legal analysis to determine if, under the provisions of the Erie policy at issue, Erie is entitled to the requested set-off/credit.

3

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On February 20, 2017, a fire occurred at Petitioners' home in Moorefield, Hardy County, West Virginia. Ms. Wratchford reported that she left the family home on the morning of February 20, 2017, at around 7:30 a.m., and that after dropping her son off at school, she traveled to Martinsburg, West Virginia, where she took a test associated with her membership in a local volunteer fire department ("VFD").[4] After taking the test, and shopping in Winchester, Virginia, Ms. Wratchford returned to her home at around 3:00 p.m., at which time she observed "puffs of smoke coming out of the eaves[.]" The Moorefield VFD responded to the fire scene, and ultimately extinguished the fire, noting the fire as "unintentional."[5]

At the time of the fire, Petitioners' home was insured by a policy of insurance issued by Erie, the *Ultracover HomeProtector Insurance Policy*, Policy No. Q536501730 (the "Policy"). The Policy provided guaranteed replacement cost coverage for Petitioners' home (with estimated cost of $221,500) and personal property coverage of $166,125. The

---

[4] At the time of the fire loss, Petitioners were both members of the Moorefield VFD. Mr. Wratchford had been a VFD member for twenty-four years at the time of the underlying incident, having served for sixteen years (at that time) as Chief Engineer. Ms. Wratchford had been a member of the Moorefield VFD for three years at the time of the fire loss.

[5] Initially, it was the belief of the Moorefield VFD Chief, Doug Mongold, that the fire may have been caused by faulty electrical wiring, as he had observed damaged wiring in Petitioners' home.

Policy also provided coverages for payment of additional living expenses (for a period of time not to exceed twelve months), trees, shrubs, plants, and lawns.

There is no dispute that Erie was promptly notified of Petitioners' fire loss and, that same day, it contacted investigators with Fire & Safety Investigation Consulting Services, LLC ("FSI") to complete a cause and origin investigation of the fire. The following day, Erie adjuster Chad Tuttoilmondo personally inspected the loss location and took recorded statements of both Petitioners. On February 23, 2017, Christopher Brent Harris of FSI completed an initial scene investigation. Mr. Harris reported that he was unable to identify any potential ignition sources in the area of the fire. He reported observing heavy charring on the top of the steps in the basement, but only partially uncharred areas on the underside of the steps. This observation led Mr. Harris to conclude that the fire was located on the top side of the stair treads, and led him to believe that the fire was incendiary in nature.[6] Given this finding, Mr. Harris recommended that Erie retain

---

[6] Because of his finding that the fire may be incendiary in nature, Mr. Harris contacted the West Virginia State Fire Marshal's Office ("SFMO") through its Arson Hotline to report the fire. The SFMO assigned Assistant State Fire Marshal ("ASFM") Ronald C. "Mackey" Ayersman to investigate the fire loss. At the time he was assigned to investigate the fire loss through the SFMO, Mr. Ayersman was also a part-time employee of FSI. A complaint to the West Virginia Ethics Commission against Mr. Ayersman was filed by Mr. Wratchford during the pendency of the underlying proceedings. The Ethics Commission completed its investigation and dismissed the complaint, finding that Mr. Ayersman had not "materially violated any prohibition of the Ethics Act, West Virginia Code §§ 6B-1-1 to 6B-3-11" in working for both FSI and the WV SFMO on the same fire loss investigation.

an electrical engineer to examine the electrical system of the Wratchford home to rule out any possible electrical causes for the fire.

Utilizing its own investigative services section, Erie brought in its senior internal investigator, Phillip Jones, to perform a further investigation into the fire loss. During his investigation, Mr. Jones discovered that Petitioners had a number of delinquencies and high credit usage noted on their credit reports.[7] On February 24, 2017, Mr. Jones conducted an initial inspection of the fire loss location and took additional recorded statements of Petitioners. It was during these second recorded statements that Petitioners first advised Erie that they had both smelled a burning, electrical smell in the downstairs bathroom area of their home in the weeks leading up the fire. In fact, Mr. Wratchford advised that in response to the smell, he used a "thermal imager" in the area to see if there were any "hot spots" behind the walls of the home, but no such spots were detected.

On February 24, 2017, the SFMO representative, Mr. Ayersman, completed an initial inspection of the site of the fire as part of the SFMO's cause and origin

---

[7] The record reflects that Petitioners were four to six payments behind on their mortgage at the time of the fire loss, amounting to $6,218.50, plus $255 in late fees (mortgage payments were $1,243.70 per month).

investigation.[8] Mr. Ayersman took samples from the fire loss area for independent testing to be performed by the West Virginia State Police. Based upon his investigation, Mr. Ayersman opined that the fire was incendiary in nature, as he could eliminate all accidental and electrical causes for the fire. Moreover, during his inspection of the basement stairs area, Mr. Ayersman used a device to detect ignitable liquids, and the device alerted to the presence of such liquids.[9] On March 3, 2017, Phillip Jones, Mr. Ayersman, Christopher Brent Harris, and Dr. Bert Davis (an electrical engineering expert retained by Erie) returned to Petitioners' home for further investigation of any potential electrical or other causes of fire.

As a result of the second inspection of Petitioners' home, on March 3, 2017, Dr. Davis opined that he could eliminate "electrical service" as having caused the fire. Dr. Davis explained that the damaged wire observed by Moorefield VFD Chief Mongold was caused by the fire, rather than being the source of the fire. Dr. Davis' opinion was

---

[8] This matter was previously heard by the Supreme Court of Appeals of West Virginia ("SCAWV") on the issue of the qualified immunity of the ASFM and the West Virginia SFMO. *See Ayersman v. Wratchford*, 246 W. Va. 644, 874 S.E.2d 756 (2022). In *Ayersman*, the SCAWV upheld the circuit court's ruling which denied, in part, Ayersman and SFMO's motions for summary judgment asserting qualified immunity, as "several genuine disputes of material fact remained which defeat immunity" – namely the alleged intentional acts of Mr. Ayersman.

[9] While the presence of ignitable liquids was initially detected by Mr. Ayersman, independent post-fire testing completed separately by the West Virginia State Police and a company retained by FSI, found no presence of ignitable liquids in the samples provided for testing.

7

corroborated in the March 15, 2017, report of FSI. In that report, FSI investigator Harris opined that the fire at Petitioners' home was incendiary in nature, as all accidental and electrical causes for the fire had been eliminated.

Conversely, an expert retained by Petitioners, Lawrence Rine, opined that the fire was caused by electrical issues, namely "arcing" that occurred due to a staple having perforated the sheathing around some of the wiring. Specifically, Mr. Rine opined that the "root cause of the February 20, 2017, fire [w]as a short circuit and resulting arcing created by the damaged furnace circuit and furnace control wiring by its installation at the northwest area of stairwell along with the overdriven staple(s)." In a second supplemental report, Mr. Rine again concluded that "[t]he February 20, 2017, Wratchford residence fire was the result of improperly installed NM Cable with the ensuing arcing resulting in carbon arc tracking causing the fire."

On March 9, 2017, at the request of Mr. Ayersman, Ms. Wratchford voluntarily submitted to a polygraph examination.[10] During the examination, she denied

---

[10] In their underlying complaint, Petitioners allege that, in addition to submitting to a polygraph examination, Tammy Wratchford was interrogated by then West Virginia State Police Officer Kevin Pansch and Mr. Ayersman from 10 a.m. through 2:30 p.m. at the West Virginia State Police barracks. During this interrogation, Mr. Ayersman reportedly advised Ms. Wratchford that he intended to "destroy her life" and demanded that she confess to intentionally setting fire to her home. Ms. Wratchford contends that she was so upset over the interrogation that she became physically sick. Petitioners further allege that following her interrogation, Ms. Wratchford attempted suicide (by locking herself in the home at issue and overdosing on insulin and blood pressure medicine).

8

any involvement in or knowledge regarding the cause of the fire. The results of the polygraph reportedly indicated that Ms. Wratchford was being deceptive. Upon additional questioning, Ms. Wratchford allegedly admitted that, in the several weeks before the fire, she had attempted to commit arson by placing a candle underneath a tree in the living room of her home.[11] Further investigation by the SFMO revealed that Ms. Wratchford, as an employee of the WV DMV, had "used her position" to renew her vehicle registrations without paying the associated personal property taxes.[12] Additionally, the SFMO's investigation revealed that Petitioners' home was in the process of being foreclosed upon in the weeks leading up to the fire.[13]

---

[11] Ms. Wratchford later denied making this admission. As noted by the SCAWV in *Ayersman*, Ms. Wratchford's own deposition includes multiple references to this incident. Thus, the SCAWV noted that "[a] jury might reasonably construe her statements as an admission to a prior arson attempt." During her testimony before the grand jury, Ms. Wratchford testified that leaving the candle burning under the tree was simply an error (she forgot about the candle). The candle she left burning during the prior incident was discovered by her son and extinguished before any fire was started.

[12] The record reflects that Ms. Wratchford was an employee of the WV DMV from 1999 until April 12, 2017, when she voluntarily resigned. Ms. Wratchford submitted a written letter of resignation to the DMV on April 12, 2017, indicating that she was resigning, of her own free will, due to "circumstances beyond [her] control." Further, Ms. Wratchford prepared a handwritten note (that was witnessed) admitting that she "renewed" her "vehicle tags for the past three years without having paid personal property tax." An internal DMV memorandum noted that Ms. Wratchford used her position at the DMV to "coerce employees into renewing her plates without all the information needed to do so; in violation of [West Virginia Code §] 17A-3-3a(1)." The memorandum further noted that Ms. Wratchford "elected to resign in lieu of termination." Ms. Wratchford was not criminally charged as a result of this alleged "fraudulent scheme."

[13] By letter dated February 13, 2017, Summit Community Bank (Petitioners' mortgage lender) requested that its attorney, William H. Bean, initiate foreclosure proceedings against Petitioners, as Petitioners were then 145 days past due on their

On March 21, 2017, Petitioners retained counsel to represent them in the underlying case. In light of the findings of Erie's retained expert witnesses, on April 26, 2017, Petitioners submitted to examinations under oath ("EUO") conducted by counsel for Erie. That same day, Petitioners submitted a "proof of loss" to Erie for both their home/dwelling ($181,038.67) and personal property damages ($160,148.42) due to the fire at issue. By letter dated June 27, 2017, Petitioners demanded settlement of their property damage claims for $221,500 (a total loss of their home) and $160,148.42 (personal property damages). In response, by letter dated July 11, 2017, Erie denied coverage for all property damage losses based on claims of arson and misrepresentation by Petitioners, amounting to insurance fraud. The denial was based upon various provisions of the Erie policy, including the intentional acts exclusion, provisions regarding concealment, fraud and misrepresentation, and the failure to cooperate in Erie's investigation by providing incomplete and untruthful responses during the EUO.

On June 16, 2017, a criminal complaint was filed in Hardy County Magistrate Court against Ms. Wratchford by Mr. Ayersman, in his role as ASFM.[14] The

---

mortgage. While Petitioners were not copied on this letter, Ms. Wratchford was copied on e-mails from Summit Bank's Director of Debt Management, dated January 26, 2017, noting that Summit would not enter into "another payment arrangement" with Petitioners and that Petitioners should expect to receive notification from Summit's attorney regarding foreclosure within the following week.

[14] Mr. Ayersman reported that his supervisors at the WV SFMO reviewed his entire case file, along with his findings, and directed him to "pursue criminal charges against [Ms.] Wratchford." Ms. Wratchford was charged with first-degree arson, two counts of

criminal complaint was reviewed by a Hardy County Magistrate, who found probable cause to issue an arrest warrant for Ms. Wratchford. Ms. Wratchford was subsequently arrested, but was granted bail. Thereafter a preliminary hearing was completed in the Magistrate Court of Hardy County and probable cause was found to exist. Ms. Wratchford's case was then "bound over" to be considered by a grand jury. Ultimately, all criminal charges against Ms. Wratchford were dismissed, when the grand jury found "no true bill" and no basis for a felony criminal indictment. Petitioners allege that because of the publicity surrounding the case and due to the arrest of Ms. Wratchford, she was "placed on administrative leave from her duties as a volunteer member of the Moorefield" VFD and was banned from attending VFD functions. Further, Ms. Wratchford contends that she was suspended from her paid and volunteer emergency medical technician ("EMT") jobs and was placed on administrative leave from her paid duties as an emergency medical services ("EMS") instructor with RESA VIII Public Service Training. Moreover, Petitioners contend that their child was "accosted" at Moorefield High School (by fellow students) due to Ms. Wratchford's arrest.

In September of 2017, despite having denied Petitioners' claim for insurance benefits, Erie issued a check to Petitioners' mortgage lender, Summit Community Bank, in the amount of $168,723.90, the amount outstanding on the Wratchfords' mortgage for the property at issue. Approximately five months later, on February 13, 2018, Petitioners filed

---

burning or attempting to burn insured property, insurance fraud, and attempt to commit arson. Mr. Wratchford was never charged criminally related to the underlying fire loss.

the underlying lawsuit against Erie (and several other defendants).[15] An amended complaint was filed by Petitioners on July 5, 2018, adding the West Virginia SFMO as a named defendant.

In their amended complaint, Petitioners asserted a number of claims against Erie, including claims for: negligence (in Erie's reliance upon the work product of Erie investigators in determining the cause of the fire); breach of contract; intentional violations with malice (citing Erie's breach of insurance contract for its own economic benefit); tortious interference with employment (causing Ms. Wratchford's termination from her job at the DMV); intentional infliction of emotional distress; civil conspiracy; malicious prosecution; abuse of process; respondeat superior; and Erie's alleged violation of the UTPA.

In its answer to Petitioners' amended complaint, Erie asserted the defenses of accord and satisfaction, payment, release, waiver, assumption of risk, and all applicable defenses provided by Rules 8, 9, and 12 of the West Virginia Rules of Civil Procedure. Petitioners' claims of intentional violations with malice and their claims for punitive damages were dismissed by order dated May 18, 2018. Petitioners' claim of tortious

---

[15] Those persons named as defendants in Petitioners' original underlying complaint were Erie; Chad Tuttoilmondo (Erie adjuster); Phillip Jones (Erie investigator); Fire & Safety Consulting Services, LLC; Christopher Brent Harris; Forensic Consultants & Engineers, Inc. d/b/a Romualdi Davidson & Associates, Inc.; Bert N. Davis; BDA Engineering, Inc.; and Ronald Ayersman.

interference with employment was dismissed by order dated February 9, 2021. The surviving claims were resolved during a sixteen-day jury trial, which began on May 4, 2023.

As to post-suit settlement negotiations between the parties, the record reflects that no post-litigation settlement demands were made to Erie by Petitioners until the first mediation, which occurred on January 24, 2020, at which Petitioners demanded "a single, collective settlement demand to [all] the defendants in the amount of $7,000,000." To this demand, the defendants collectively offered $400,000, of which Erie (for itself, Chad Tuttoilmondo, and Mr. Jones) agreed to contribute $150,000. This settlement offer was rejected and no further settlement negotiations occurred.

During jury deliberations, on May 24, 2023, the jury presented two written questions to the court. In the first question, the jury asked "We are not sure about the Unfair Trade Practices Act. Can we get clarification?" In the second question, the jury asked, "We need to know what a 'no true bill' is." Counsel and the court discussed the questions and the jury was brought back into the courtroom and advised that as to question one, that they must rely upon the court's instructions. As to question two, the jury was advised that "[a]ny time a grand jury does not return an indictment, that is referred to as a no true bill."

The following day, on May 25, 2023, the jury posed two additional written questions to the court. In the first question, the jury asked if it was "bound to give

13

compensation of $590,542 as [estimated] by the [Petitioners'] contractor. Or can we award a fraction?" In the second question, the jury asked if it was "bound to the estimate of $188,378 [for personal property damages] or can we award a fraction?" Upon agreement of counsel, the court responded to the jury in writing, indicating that "[n]o, you are not bound; you may award such damages as you find have been proven from the evidence." Less than an hour later, the jury returned with its verdict.

As to its claims against Erie, the jury found that Petitioners had proven, by a preponderance of the evidence, that: 1) they had a valid Policy of insurance with Erie; and 2) they were entitled to benefits under such Policy, but that Erie breached the Policy and did not provide those benefits; and 3) that Erie's breach resulted in damages to Petitioners. However, the jury found that Erie did not commit "multiple violations of the" UTPA, and determined that Petitioners had not established that Erie, or any of the other defendants, owed them "a duty that had been breached." Similarly, the jury concluded that Petitioners did not establish that any of the defendants, including Erie, "acted with conduct that was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency[;]" acted with "intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his/its conduct[;]" or caused Petitioners "to suffer emotional distress that was so severe that no reasonable person would be expected to endure it." The jury also found that Petitioners did not prove their claims for malicious prosecution or abuse of process, and that there was no civil conspiracy against Petitioners. As to their claims for respondeat superior, the jury found that

14

Petitioners did not prove that Erie had a master/servant or employee/employer/agent relationship with Christopher Brent Harris, Mr. Ayersman, or Dr. Davis during their investigation of the house fire at issue. As a result of the jury trial, Erie was the only defendant found to be liable to Petitioners in any respect.

The jury awarded Petitioners contractual damages of $687,742.57 (including dwelling coverage of $590,542.57 (the replacement cost of Petitioners' home based upon the testimony of Petitioners' expert); personal property coverage of $90,000; and twelve months' rental expenses of $7,200). Additionally, the jury awarded Petitioners $40,800 for additional rental expenses and $58,991.50 for attorney's fees and costs related to the defense of Ms. Wratchford in her criminal prosecution for arson and insurance fraud. The jury did not award Petitioners the $5,701.58 they claimed in "landscaping repairs[,]" which included alleged damages to the trees, shrubs, plants, and the lawn of their Erie-insured property due to the fire loss. A judgment order was entered by the circuit court on March 18, 2024, against Erie for the sum of $787,534.07.

Petitioners filed a number of post-trial motions, including a motion for judgment notwithstanding the verdict; motion for judgment notwithstanding verdict on damages; motion for new trial/second trial on failure to provide non-economic damages including aggravation and inconvenience under *Hayseeds*; motion for new trial on prejudgment interest and economic losses resulting from delay in payment; motion to hold prejudgment interest as non-final adjudication of damages and to delay appeal time

15

pending second trial; and motion for post-judgment interest from date of jury verdict. The court denied each of these motions, as well as Petitioners' supplemental motion to find that they "substantially prevailed" in the property damage suit against Erie and for a second *Hayseeds* trial.

Erie filed a motion to alter or amend judgment seeking a set-off in the dwelling coverage damages awarded to the Wratchfords in the amount of $168,723.90, the amount of the payment Erie sent to the Wratchfords' mortgage lender, Summit Community Bank, in satisfaction of the mortgage on the property at issue, which the circuit court denied. It is from the circuit court's February 2, 2024, order; March 18, 2024, Judgment Order; and July 22, 2024, orders that Petitioners appeal. Erie now appeals from the circuit court's July 22, 2024, Order Denying [Erie's] Motion to Alter or Amend Judgment [Order] to Reduce the Award of Contractual Damages and to Vacate the Award of Non-Contractual Damages.

## II. STANDARD OF REVIEW

The standard of our review is different for several of the seven issues raised by the parties in their consolidated appeals. Therefore, the standard for our review for each issue is set forth in our discussion of the individual issues below. However, generally, we note that

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition

16

under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 2, *Walker v. W. Va. Ethics Comm'n*, 201 W. Va. 108, 492 S.E.2d 167 (1997).

## III.   DISCUSSION

On appeal, Petitioners raise six assignments of error and Respondent Erie argues one assignment of error, which we will address in turn. In their first and third assignments of error, which we have combined as they are interrelated,[16] Petitioners argue that the circuit court erred in denying their post-trial motions requesting a finding that Petitioners "substantially prevailed" against Erie, with respect to their property damage claims arising from the 2017 fire loss, and that the court further erred in denying Petitioners their associated attorney's fees and expenses.

We begin our analysis by recognizing, as the SCAWV did in *Hayseeds,* that "[w]henever a policyholder substantially prevails in a ... suit against its insurer, the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience." Syl. Pt. 1, *Hayseeds* 177 W. Va. at 324, 352 S.E.2d at 74. Thus, Petitioners' entitlement to reasonable attorney's fees and expenses under

---

[16] See generally *Tudor's Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (per curiam) (consolidating assignments of error).

*Hayseeds* is dependent upon the circuit court's ruling as to whether Petitioners substantially prevailed.

In *Miller v. Fluharty*, 201 W. Va. 685, 500 S.E.2d 310 (1997), the SCAWV defined "substantially prevails" and held that

> An insured 'substantially prevails' in a property damage action against his or her insurer when the action is settled for an amount equal to or approximating the amount claimed by the insured immediately prior to the commencement of the action, as well as when the action is concluded by a jury verdict for such an amount. In either of these situations the insured is entitled to recover reasonable attorney's fees from his or her insurer, as long as the attorney's services were necessary to obtain payment of the insurance proceeds.

*Id.* at Syl. Pt. 2.

Below, the circuit court found that Petitioners did not "substantially prevail" in their claims against Erie, as Petitioners' post-litigation settlement demand of $7,000,000, was exponentially higher than the $787,534.07 Petitioners were awarded at trial.[17] Per the SCAWV, we "will review a trial court's determination of whether a plaintiff has 'substantially prevailed' in an insurance claim, such as the one presently before [this] Court, under an abuse of discretion standard." *Jones v. Sanger*, 217 W. Va. 564, 568-569,

---

[17] Specifically, the circuit court found that "[o]btaining less than nine percent (9%) by jury verdict of the amount [Petitioners] demanded in settlement is not 'substantially prevailing' under *Hayseeds*."

18

618 S.E.2d 573, 577-578 (2005) (per curiam) (citing Syl. Pt. 4, *Burgess v. Porterfield*, 196 W. Va. 178, 469 S.E.2d 114 (1996)).

Based upon our review of the record and applicable law, we find that the circuit court abused its discretion in denying Petitioners' motion for a determination that they had "substantially prevailed" in their claims against Erie. Here, the circuit court failed to consider the totality of the settlement negotiations between the parties, including the parties' pre-litigation settlement negotiations. The court's analysis makes no reference to the parties' pre-litigation settlement demand, which, while not dispositive of a determination of "substantially prevailing[,]" is certainly a factor that must be considered by the court and should not be ignored.

The *Miller* Court held that "[w]hen examining whether a policyholder has substantially prevailed against an insurance carrier, a court should look at the negotiations as a whole from the time of the insured event to the final payment of the insurance proceeds." *Id.* at Syl. Pt. 4, 201 W. Va. at 689, 500 S.E.2d at 314. The circuit court below did not "look at the [settlement] negotiations [of the parties] as a whole[,]" but considered only the parties' post-litigation settlement negotiations. Accordingly, we find that the circuit court erred in determining that Petitioners did not "substantially prevail" in the underlying case, and we reverse the circuit court's July 22, 2024, Substantially Prevailed Order. *See Banker v. Banker*, 196 W. Va. 535, 550, 474 S.E.2d 465, 480 (1996) (finding that "the failure to give sufficient consideration to a significant factor constitutes an abuse

19

of discretion requiring a remand for further consideration"). We remand this matter to circuit court and direct that the court complete an analysis to determine whether Petitioners substantially prevailed below, and consider all of the parties' settlement demands and offers, as directed by the SCAWV in *Miller*. Further, we note that should the circuit court find that Petitioners substantially prevailed in their underlying case against Erie, that the court should award Petitioners "reasonable attorney[']s fees[.]" *See Miller* at Syl. Pt. 1, 201 W. Va. at 688, 500 S.E.2d at 313.[18]

In their second, fifth, and sixth assignments of error, Petitioners argue that the circuit court erred in failing to grant their motion for a new trial on *Hayseeds* damages and their motions for judgment notwithstanding the verdict, or alternatively a new trial, on aspects of their property damage claim, including damage to trees, shrubs, plants, and their lawn, as well as the award of out-of-pocket interest paid on their mortgage and their claims related to Erie's alleged violation of the UTPA in handling Petitioners' underlying claims. In *Tennant v. Marion Health Care Foundation, Inc.*, 194 W. Va. 97, 104, 459 S.E.2d 374, 381 (1995), the SCAWV noted that "[a]s a general proposition, we review a circuit court's rulings on a motion for a new trial under an abuse of discretion standard." (citation omitted). Further, the SCAWV has explained that:

---

[18] Regarding attorney's fees, "we apply an abuse of discretion standard when reviewing the lower court's award of attorney fees." *CIT Bank, N.A. v. Coffman*, 250 W. Va. 464, 474, 904 S.E.2d 466, 476 (2024).

The ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

*Grimmett v. Smith*, 238 W. Va. 54, 59-60, 792 S.E.2d 65, 70-71 (2016) (quotation marks and citations omitted). As to a motion for judgment as a matter of law (judgment notwithstanding the verdict), the SCAWV has stated that:

[a] motion for judgment [as a matter of law] may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. Where there is sufficient conflicting evidence, or insufficient evidence to establish conclusively the movant's case, judgment [as a matter of law] should not be granted. In considering the motion, the trial court and the appellate court must view the evidence in the light and with all reasonable inferences most favorable to the party who secured the jury's verdict.

*Sias v. W-P Coal Co.*, 185 W. Va. 569, 577, 408 S.E.2d 321, 329 (1991). Further, "[i]n a case where the evidence is such that the jury could have properly found for either party upon the factual issues, a motion for judgment notwithstanding the verdict should not be granted." Syl. Pt. 7, *McClung v. Marion Cnty. Comm'n*, 178 W. Va. 444, 360 S.E.2d 221 (1987).[19]

---

[19] "Rule 50(b) [of the West Virginia Rules of Civil Procedure] is titled [Renewing the motion after trial; alternative motion for new trial] This Rule . . . has replaced the terms 'directed verdict' and 'judgment notwithstanding the verdict' with the all-encompassing term, 'judgment as a matter of law.'" *See Gregory v. Long*, Nos. 23-ICA-421 and 23-ICA-422, 2024 WL 4041383, at *2 n.5 (W. Va. Court App. Sept. 4, 2024) (memorandum decision); *see also Robertson v. Opequon Motors, Inc.*, 205 W. Va. 560, 563, 519 S.E.2d 843, 846 (1999) (per curiam), wherein the SCAWV noted that "litigants should employ the phrase 'judgment as a matter of law' in place of the phrases 'directed verdict' and

We begin by acknowledging that:

[u]nder the [West Virginia Rules of Civil Procedure] [1998][20], when a party has failed during a jury trial to make a motion for judgment as a matter of law under Rule 50(a) challenging the sufficiency of the evidence, that party has waived the right to mount any post-trial attack on the sufficiency of the evidence under Rule 50(b). Additionally, if the party moves for a new trial under Rule 59 and attempts to challenge the sufficiency of the evidence supporting the verdict, then the scope of review of the motion is confined to whether there was any evidence to support the jury's verdict, irrespective of its sufficiency, and which, if not addressed by the court, would result in a manifest miscarriage of justice.

Syl. Pt. 5, *McInarnay v. Hall*, 241 W. Va. 93, 818 S.E.2d 919 (2018).

Additionally, we note the SCAWV's reasoning in *McInarnay* that,

a party's failure to make a preverdict motion challenging the sufficiency of the evidence, as required by Rule 50(a) [of the West Virginia Rules of Civil Procedure] completely waives the party's right to make the same challenge to the sufficiency of the evidence after the trial under Rule 50(b). The failure to make the preverdict motion also forecloses the right to raise an insufficient evidence challenge on appeal.

*Id*. at 99-100, 818 S.E.2d at 925-926.

---

'judgment notwithstanding the verdict[.]" Accordingly, this Court will construe Petitioners' motions for judgment notwithstanding the verdict as motions for judgment as a matter of law.

[20] We refer to the version of Rule 50 in effect during the underlying proceedings. The newest revisions to the Rules became effective January 1, 2025.

Here, there is no dispute that Petitioners did not move for judgment as a matter of law as to any of their claims during the trial of this matter. Accordingly, we find that the circuit court did not err in finding that because of this omission, Petitioners have now waived the right to challenge the jury's verdict via their motions for judgment notwithstanding the verdict.

Further, considering each of Petitioners' motions as motions for new trial on these issues, we again find no error in the circuit court's denial of Petitioners' motions.[21]

---

[21] Below, Petitioners proffered Jury instruction, Instruction No. 8, "Substantially Prevail[.]" The instruction was adopted by the circuit court and read to the jury. The instruction reads as follows:

In the event that you find in favor of the [Petitioners] against Erie in the enforcement of the Homeowner's Policy of Insurance in effect on their home at the time of the fire on February 20, 2017, you may direct, in addition to other damages, that the insurer, Erie, is liable for (1) any damages proven by the Plaintiffs, by preponderance of the evidence, for net economic loss caused by the delay in settlement, and (2) damages for aggravation and inconvenience. In considering whether the [Petitioners] have substantially prevailed for the property damages claimed in this action against Erie, it is not necessary for the [Petitioners] to prove that the insurance company acted in bad faith, without good faith, or with any intent to injure. It is necessary only that the [Petitioners] substantially prevailed in obtaining insurance coverage for their property loss under the Erie Homeowner's Insurance policy in the jury verdict form an amount equal to or approximating the amount claimed by the insureds within their proof of loss forms submitted to Erie prior to the commencement of this legal action. In other words, if you as a jury have found property damage losses of the dwelling and/or the personal property of the [Petitioners] which are approximately equal to or exceed the amount claimed by [Petitioners] on their proof of loss form submitted to Erie for payment following the fire loss, the [Petitioners] have "substantially prevailed", and the insurer is liable for the [Petitioners'] damages for net economic loss caused by the delay in settlement, as well as

Here, the jury heard evidence as to each element of Petitioners' alleged damages, and simply did not find that such claims were supported by the evidence offered at trial. This is particularly demonstrated in the written questions to the circuit court that the jury below raised during their deliberations, in which they asked if they were required to award full damage estimates to Petitioners, to which the court responded (as agreed to by Petitioners) that the jury "may award such damages as you find have been proven from the evidence." Here, the jury, making its own credibility determination, did not find support in fact for the damages claimed by Petitioners.

Moreover, we agree with the circuit court's determination that Petitioners have shown "no prejudice, bias, undue influence, misconduct, oversight, or some misconception of the facts or law during trial." To the extent that Petitioners raise issues with jury instructions or the verdict form, we note that Petitioners' counsel was very

---

damages for aggravation and inconvenience to the [Petitioners] resulting from the failure of Erie to timely pay for the losses claimed by the [Petitioners].

However, determinations whether a party "substantially prevailed" are made by circuit courts. Thus, even with this "Substantially Prevail" instruction, the jury found that Petitioners did not establish, with reasonable certainty, that they were entitled to any "Non-Economic Damages[]" (in the "Verdict Form" below), which specifically included:

annoyance, inconvenience, embarrassment, humiliation, loss of dignity, emotional distress, mental anguish, upset, damage to good name and reputation in the community, shame, mental and physical damages as allowed for Violations of Unfair Trade Practices/Unfair Claim Settlement Practices, Negligence, Intentional Infliction of Emotional Distress, Malicious Prosecution, Abuse of Process, Civil Conspiracy, [and] Respondeat Superior.

24

involved in the creation of the instructions and verdict form used by the court below and agreed to the use of said instructions and verdict form.[22] Further, we note the extremely gracious nature of the court below to provide counsel with broad discretion to include all of the "descriptors" of non-economic damages Petitioners deemed necessary in the verdict form.[23] Wherefore, based on the foregoing, we find no error.

In their fourth assignment of error, Petitioners contend that the circuit court erred in denying their motion for prejudgment interest. As to prejudgment interest, the SCAWV has held that:

> In reviewing a circuit court's award of prejudgment interest, we usually apply an abuse of discretion standard. When, however, a circuit court's award of prejudgment interest hinges, in part, on an interpretation of our decisional or statutory law, we review *de novo* that portion of the analysis." Syllabus Point 2,

---

[22] As to *Hayseeds*, Petitioners specifically argue that the verdict form was deficient in that it did not include a provision for the jury to find damages upon a finding that the Petitioners "substantially prevailed[.]" However, the jury verdict form proffered by Petitioners to the court also did not include such a provision. Moreover, we find that the jury instruction regarding "substantially prevailing" proffered by the Petitioners and read to the jury clearly identified that Petitioners were seeking *Hayseeds* damages, which included aggravation and inconvenience. Moreover, it is clear to this Court that such damages were encompassed in the description of "Non-Economic Damages" contained within Question 16 of the verdict form.

[23] During a hearing with counsel before the trial proceeded on May 24, 2023, the court stated to counsel for Petitioners, in part, when discussing non-economic damages, "so just make sure you get all the categories in there that are allowed by law." In response, counsel for Petitioners advised the court "[e]mbarassment, shame, mental anguish, upset, annoyance, inconvenience, damage to good name and reputation of the [Petitioners] in the community, as well as mental and physical damages. As long as we got those, yes, I think we got them."

25

*Hensley v. W. Va. Dep't of Health & Human Res.*, 203 W. Va. 456, 508 S.E.2d 616 (1998).

*Just. Highwall Mining, Inc. v. Varney*, 249 W. Va. 1, 12, 890 S.E.2d 685, 696 (Ct. App. 2023) (quoting Syl. Pt. 14, *Tri-State Petroleum Corp. v. Coyne*, 240 W. Va. 542, 814 S.E.2d 205 (2018)). Further, "[t]o the extent this appeal is based on the calculation of prejudgment interest, it is subject to *de novo* review." *Doe v. Pak*, 237 W. Va. 1, 4, 784 S.E.2d 328, 331 (2016) (citing *State Farm Mut. Auto. Ins. Co. v. Rutherford*, 229 W. Va. 73, 76, 726 S.E.2d 41, 44 (2011)).

The jury below awarded Petitioners $687,742.57 in damages related to Erie's breach of its insurance contract (under the Policy at issue) with Petitioners. Additionally, the jury awarded Petitioners non-contractual damages in the amount of $99,791.50 ($40,800 for additional rental expenses and $58,991.50 for attorney's fees regarding defense of Ms. Wratchford's associated criminal prosecution). Erie advised the court below, and maintains its position before this Court, that it does not challenge an award of prejudgment interest on the non-contractual damages, but limits its objection to Petitioners' request for prejudgment interest on the contractual damages awarded by the jury, as Petitioners did not request that the jury award prejudgment interest below.

The circuit court denied Petitioners' motion for prejudgment interest on their contractual damages awarded by the jury. As to prejudgment interest, the court specifically

26

concluded that West Virginia Code § 56-6-27[24] (providing prejudgment interest in any action founded on contract) does not create an exception for insurance contracts or limit its applicability to contracts having fixed interest rates. Additionally, the court ruled, as the SCAWV held in Syllabus Point 1 of *Miller v. Wesbanco Bank, Inc.*, 245 W. Va. 363, 859 S.E.2d 306 (2021), that: "West Virginia Code [§] 56-6-27 [1923] provides the exclusive means by which to obtain prejudgment interest in any action founded on contract. Failure to submit the question of prejudgment interest to the jury results in waiver of the same." Below, there is no dispute that the Petitioners did not place the question of prejudgment interest before the jury for determination. Thus, as applicable to contractual damages awarded by the jury herein, we find no error in the circuit court's denial of Petitioners' motions for prejudgment interest. Moreover, we agree with the circuit court's conclusion that prejudgment interest is not a "liquidated damage" as part of *Hayseeds*, as argued by Petitioners (for which Petitioners provide no direct legal authority).[25]

---

[24] West Virginia Code § 56-6-27 provides that

> The jury, in any action founded on contract, may allow interest on the principal due, or any part thereof, and in all cases they shall find the aggregate of principal and interest due at the time of the trial, after allowing all proper credits, payments, and sets-off; and judgment shall be entered for such aggregate with interest from the date of the verdict.

[25] We additionally find no merit in Petitioners' argument that West Virginia Code § 56-6-31(b) permits this Court to assess prejudgment interest on special and liquidated damages. "The general rule of statutory construction requires that a specific statute [providing for prejudgment interest in contract cases] be given precedence over a general statute [general provisions for prejudgment interest for special or liquidated damages] relating to the same subject matter[.]" *Robinson v. City of Bluefield*, 234 W. Va. 209, 214,

Erie raises one assignment of error on appeal and argues that the circuit court erred in denying their set-off/credit equal to the amount Erie paid to satisfy Petitioners' mortgage prior to the trial of the underlying case.[26] Erie argued that it was entitled to relief as Petitioners were awarded, at trial, the full replacement cost of their home, and the Erie Policy at issue "simply does not provide coverage for the mortgage amount *plus the full cost to replace the home*." In denying Erie's motion, the court erred found that notice of a set-off was required pursuant to West Virginia Code §§ 56-5-4 and 56-5-5, and that Erie had given no such notice in the case at bar. We disagree.

Based upon our review of the record here, we find clear error and reverse the circuit court's denial of Erie's motion. Specifically, we find that West Virginia Code §§ 56-5-4 and 56-5-5 are inapplicable to the underlying action. Further, we find that our review of the record herein reflects that Erie had given notice to Petitioners as to its satisfaction of Petitioners' mortgage.

The SCAWV has long held that as to contractual agreements, such as insurance policies, "[i]t is the province of the court, and not of the jury, to interpret a written

---

764 S.E.2d 740, 745 (2014) (quoting Syl. Pt. 1, *UMWA by Trumka v. Kingdon*, 174 W. Va. 330, 325 S.E.2d 120 (1984)). Here, Erie did not object to Petitioners being awarded prejudgment interest on their non-contractual damages, which is in accord with the provisions of West Virginia Code § 56-6-31(b).

[26] On appeal, Erie noted that it sought to "alter or amend the judgment awarded [to Petitioners], not the jury's verdict."

contract." Syl. Pt. 1, *Stephens v. Bartlett*, 118 W. Va. 421, 191 S.E. 550 (1937). As to the interpretation of an insurance contract, the SCAWV has found that "[t]he interpretation of an insurance contract . . . is a legal determination that, like a lower court's grant of summary judgement, shall be reviewed *de novo* on appeal." *See* Syl. Pt. 2, *Riffe v. Home Finders Assoc., Inc.*, 205 W. Va. 216, 517 S.E.2d 313 (1999).

We begin our review of Erie's instant claim by examining the Erie Policy at issue and its provisions regarding Petitioners' mortgage. The Policy at issue noted, in pertinent part, in the ***POLICY CHANGE ENDORSEMENT – WEST VIRGINIA, RIGHTS AND DUTIES – CONDITIONS – Section I, LOSS PAYMENT*** that: "**We** [Erie] will settle any claim for loss with you [Petitioners]. **We** will pay you unless some other person is named in the policy or is legally entitled to receive payment." Further, the Policy, at the ***RIGHTS AND DUTIES – CONDITIONS – SECTION I (10) MORTGAGE CLAUSE*** provides that:

> Loss under *Dwelling Coverage* or *Other Structures Coverage* shall be payable to mortgagees named on the Declarations, to the extent of their interest and in the order of precedence.
>
> **Our Duties**
>
> **We** will:
>
> 1. protect the mortgagee's interests in an insured building. This protection will not be invalidated by any act or neglect **of anyone we protect**, any breach of warranty, increase in hazard, change of ownership, or foreclosure, if the mortgagee has no knowledge of these conditions;

29

2. give mortgagee 30 days prior notice if we cancel or refuse to continue this policy.

3. give mortgagee notice if you cancel this policy.

The mortgagee will:

1. furnish proof of loss within 60 days . . . ;

2. pay upon demand any premium due . . . ;

3. notify us of any change of ownership or occupancy or any increase in hazard of which the mortgagee has knowledge;

4. give us the right of recovery against any party liable for loss. This shall not impair the mortgagee's right to recover the full amount of the mortgage debt;

5. after a loss, permit us to satisfy the mortgage requirements and receive full transfer of the mortgage and all securities held as collateral to the mortgage debt; . . .

\* \* \*

This condition shall also apply to any trustee named on the **Declarations** [Page].

The Declarations for the Policy identifies Summit Community Bank as the mortgagee for the "[p]rimary [r]esidence" covered under said Policy. Additionally, we note the SCAWV's ruling in *Jones v. Wesbanco Bank Parkersburg*, 194 W. Va. 381, 382, 460 S.E.2d 627, 628 (1995), which requires that:

If a fire insurance contract between an insurer and a property owner includes a standard mortgage clause naming as mortgagee the lender under a deed of trust executed by the property owner to secure a debt owing on the property, the lender under the deed of trust pursuant to that clause has an independent and distinct contract with the insurer, as if the

30

lender under the deed of trust had taken out a separate policy with the insurer, and is deemed to be an insured to the extent of the balance due it from the property owner. Syl. Pt. 1, *Firstbank Shinnston v. West Virginia Insurance Co.*, 185 W. Va. 754, 408 S.E.2d 777 (1991).

Thus, regardless of its position as to Petitioners' claims arising from the fire loss, Erie was obligated to satisfy Petitioners' mortgage on the home at issue with Summit Community Bank, as Summit was listed as mortgagee in the Declaration for the Policy at issue. Additionally, Erie was further obligated, as noted in the Policy, "to protect the mortgagee's interests in an insured building" and further that "[t]his protection [could] not be invalidated by any act or neglect of **anyone we protect** . . ." The Policy further required, as noted above, that any loss settlement be paid to the insured "unless some other person is named in the policy or is legally entitled to receive payment."

Without addressing Erie's duties under the Policy, the circuit court found that a notice of set-off was required by West Virginia Code §§ 56-5-4[27] and 56-5-5,[28] and that Erie did not preserve its rights by way of a counterclaim, pleading, or instruction to the jury. Conversely, Erie argues, and we agree, that the circuit court erred in applying West Virginia Code §§ 56-5-4 and 56-5-5 to the instant case.

---

[27] West Virginia Code § 56-5-4 states:

In a suit for any debt, the defendant may at the trial prove and have allowed against such debt any payment or setoff which is so described in his plea, or in an account filed therewith, as to give the plaintiff notice of its nature, but not otherwise. Although the claim of the plaintiff be jointly against several persons, and the setoff be of a debt, not to all, but only to a part of them, this section shall extend to such setoff, if it appear that the persons against whom such claim is, stand in the relation of principal and surety, and that the person entitled to the setoff is the principal. And when the defendant is allowed to file and prove an account of setoff to the plaintiff's demand, the plaintiff shall be allowed to file and prove an account of counter setoff, and make such other defense as he might have made had an original action been brought upon such setoff, and, in the issue, the jury or judge shall ascertain the true state of indebtedness between the parties, and judgment shall be rendered accordingly.

[28] West Virginia Code § 56-5-5 states:

In any action on a contract, the defendant may file a plea alleging any such failure in the consideration of the contract, or fraud in its procurement, or any such breach of any warranty to him of the title to real property . . . for the price or value whereof he entered into the contract, or any other matter, as would entitle him either to recover damages at law from the plaintiff, or the person under whom the plaintiff claims, or to relief in equity, in whole or in part, against the obligation of the contract; or, if the contract be by deed, alleging any such matter existing before its execution, or any such mistake therein, or in the execution thereof, or any such other matter, as would entitle him to such relief in equity; and in either case alleging the amount to which he is entitled by reason of the matters contained in the plea. Every such plea shall be verified by affidavit.

With respect to West Virginia Code § 56-5-4, we agree with Erie that said statute addresses the need for notice of set-off in a suit for any debt. Here, Erie is not seeking recovery or disputing any "debt[,]" as contemplated in West Virginia Code § 56-5-4; thus, we find this statutory section is inapplicable. Similarly, West Virginia Code § 56-5-5 is also inapplicable. Here, Erie is not seeking to recover any money from Petitioners, pursuant to any contract or otherwise, and is not alleging that any payments are due under the Erie policy. Simply, Erie just seeks to enforce the Policy at issue and reduce the amount of the judgment by the amount Erie paid in satisfaction of Petitioners' mortgage.

We further find issue with the circuit court's determination that Erie did not provide notice of its intent to request a set-off/credit. Our independent review of the record reveals that while Erie did not file a specific document indicating it was specifically seeking a set-off, it did reference, in its Answers to Petitioners' Complaint and Amended Complaint, that it alleged the defense of payment. Further, the fact that Erie satisfied Petitioners' mortgage was well known to Petitioners, as they specifically referenced such payment as an allegation in their Amended Complaint (See Paragraphs 48-51 of Petitioners' Amended Complaint). Further, during her trial testimony, Ms. Wratchford also acknowledged that Erie had satisfied the Petitioners' mortgage. Thus, given the SCAWV's precedent protecting the interests of mortgage lenders in fire loss cases and the multiple references in the record that Petitioners had express knowledge of Erie's satisfaction of their mortgage interest, we reverse the circuit court's denial of Erie's motion in this regard. We remand this matter to circuit court and direct that the circuit court determine if Erie is

33

entitled to the credit/set-off in the amount $168,723.90, given the provisions of the Policy at issue and this Court's findings that West Virginia Code §§ 56-5-4 and 56-5-5 are inapplicable to the instant case and that Erie provided notice of its intent to seek credit/set-off.

## IV.    CONCLUSION

Based on the foregoing, we affirm, in part, and reverse, in part the Circuit Court of Hardy County's Orders on appeal. We reverse the court's rulings on Erie's motion for set-off/credit and Petitioners' motions for a finding that they "substantially prevailed" and for associated attorney's fees and expenses. As to these motions, we remand this matter to circuit court for the court to complete determinations of whether Petitioners substantially prevailed (and, if so, award them reasonable attorney's fees and expenses) and if Erie is entitled to a set-off/credit of $168,723.90 (the amount it paid in satisfaction of Petitioners' mortgage), under the provisions of the underlying Policy. As to the remaining motions, we affirm the circuit court's rulings.

Affirmed, in part, Reversed, in part, and Remanded with directions.